## ASSOCIATED PRESS v. KVOS, Inc.
### No. 1087.

District Court, W. D. Washington, N. D.
Dec. 18, 1934.

Howard & Kindall, of Bellingham, Wash., for complainant.

Kenneth C. Davis, of Seattle, Wash., and William H. Pemberton, of Olympia, Wash., for defendant.

BOWEN, District Judge (after stating the facts as above).

■ The rule is that a motion to dismiss in equity must be judged solely by plaintiff's pleadings, and for the purposes of the motion all facts well pleaded are taken as true. The question raised in defendant's motion that in fact the amount in controversy does not exceed the sum of $3,000 is, by that rule, disposed of adversely to the defendant.

■ The question raised, also, in the motion to dismiss that there is a defect of parties complainant, in that the Bellingham Herald was not joined, must likewise be resolved against defendant, upon the authority of Federal Equity Rule 38 (28 USCA § 723), Hopkins (6th Ed.) p. 226, which provides: "When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole," and upon the authority of Merchants' & Manufacturers' Traffic Ass'n v. U. S. (D. C.) 231 F. 292, 294, where the court said: "We see no objection to classes of persons similarly situated being represented by an association or other organization and coming into the controversy under the common name. This, we think, brings this case within the well-known rule that bills may be filed in the name of an unincorporated association, and by parties on behalf of others similarly situated," and in view of the further fact that it is alleged in complainant's bill (paragraph 5, p. 2) "that complainant has more than 1200 members, each owning or representing a daily newspaper in the United States," and as stated elsewhere in the bill in effect that those members are similarly situated.

The foregoing leaves to be disposed of only the remaining question, also raised by the motion to dismiss, as to whether the bill states a cause of action in equity or any facts entitling complainant to the relief now sought.

Responding to complainant's bill and affidavits alleging that defendant obtains copies of morning editions of complainant's member newspapers and systematically reads therefrom over the radio to defendant's radio listeners the news reports in question, the statements in the affidavit of L. H. Darwin on behalf of defendant categorically deny those allegations on behalf of complainant and set forth many news sources, other than complainant's news service, available to affiant by reason of his previous experience as a newspaper man and public official and of his broad acquaintanceship.

Affiant Rogan Jones, in this affidavit on behalf of defendant, states in effect that as to the general news reports used in such radio news broadcasts, the same are obtained by the defendant under its contract with Radio News Association of New York City, which is a radio news service maintained for radio broadcasting stations which contract for that service, and that such news reports are broadcast from New York by that association to defendant and others entitled to them, by short wave length, three or more times daily, from 6 to 7 a. m., 9:30 to 10:30 a. m., 2 to 3 p. m., and 5:30 to 6 p. m., Pacific Standard Time; that such news is copyrighted and is received by KVOS in Continental Code by a licensed operator on a special high-grade and expensive apparatus in Bellingham over an antennæ arranged, located, and designed especially for this news feature, after long and expensive experimentation by defendant's station. The statements in complainant's affidavits that defendant has in many specific instances read general and local news items claimed to belong to complainant's news service, or substantial portions of such items, are clear and convincing, and, when considered in connection with the less specific statements in defendant's affidavits as to defendant's sources of general and local news information, compel the conclusion, and the court so finds, that defendant has in its radio news broadcasts taken and "pirated" local and general news dispatches in some specific instances as charged by complainant, but not until after such news items were published and distributed to the public in the regular public editions of the newspapers of complainant's members.

Complainant does not assert any rights under a statute or the copyright laws. It is not contended that the defendant procured the questioned information through a breach of contract between complainant and its

member newspapers or through some surreptitious or dishonest conduct or from a private or confidential source before the news reports were published and distributed to the public in a member newspaper. The bill charges unfair competition by the defendant, and in its brief complainant argues, in addition to that charge, that it has a property right in the news items in question, and that such property rights have been and are being violated by the defendant. In the argument before the court, counsel for complainant stressed its claim of unfair competition rather than its asserted property rights in the news reports. Complainant claims it has such property right in the news reports for at least twenty-four hours after first publication thereof in one of the newspapers of complainant's members, but that defendant has customarily broadcast the reports many hours before the expiration of such twenty-four hour period.

As upholding such property right, complainant cites The Associated Press v. Sioux Falls Broadcast Association,[1] decided by Judge Jas. D. Elliott of the United States District Court of South Dakota at Sioux Falls, on March 4, 1933, being cause No. 377 S. D. Eq., and International News Service v. Associated Press, 248 U. S. 215, 39 S. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293. Complainant insists that the South Dakota case, upholding complainant's alleged property rights, is supported by the authority of the International News Service Case. A certified copy of the findings and conclusions of the South Dakota case, supplied to this court by complainant, discloses that Judge Elliott ruled that complainant and its members have "what a court of equity will treat as a property right in news gathered and disseminated by complainant and also so called local news gathered by members of complainant and which members of complainant are obligated to transmit to complainant"; but a careful review of the International News Service Case fails to disclose a statement by the Supreme Court to the effect that complainant in that case acquired or had an absolute property right as such in news gathered by it and supplied to its member newspapers for any time after distribution to the public, or indeed for any time whatever, either before or after such publication. There seems to be no room for question that the true construction of the rule of the majority decision in that case is confined to the actual holding on the particular facts there involved and that the case turns on the point that the pirating news agency was guilty of unfair competition, in view of the opinion of Justice Pitney speaking for the majority (at page 241 of 248 U. S., 39 S. Ct. 68, 73), as follows: "It is said that the elements of unfair competition are lacking because there is no attempt by defendant to palm off its goods as those of the complainant, characteristic of the most familiar, if not the most typical, cases of unfair competition. [Citing.] But we cannot concede that the right to equitable relief is confined to that class of cases. In the present case the fraud upon complainant's rights is more direct and obvious. Regarding news matter as the mere material from which these two competing parties are endeavoring to make money, and treating it, therefore, as quasi property for the purposes of their business because they are both selling it as such, defendant's conduct differs from the ordinary case of unfair competition in trade principally in this that, instead of selling its own goods as those of complainant, it substitutes misappropriation in the place of misrepresentation, and sells complainant's goods as its own."

At page 240 of 248 U. S., 39 S. Ct. 68, 73, Justice Pitney further says: "But in a court of equity, where the question is one of unfair competition, if that which complainant has acquired fairly at substantial cost may be sold fairly at substantial profit, a competitor who is misappropriating it for the purpose of disposing of it to his own profit and to the disadvantage of complainant cannot be heard to say that it is too fugitive or evanescent to be regarded as property. It has all the attributes of property necessary for determining that a misappropriation of it by a competitor is unfair competition because contrary to good conscience."

Thus, the most that can be said of the majority rule in that case is that the majority reasons on an issue of unfair competition between news agencies in business for profit, that the complainant, whose labor and facilities have developed the news report up to the point at which the profit could first be realized, might be said to have a quasi property in the news reports gathered by it for the purposes of its business as against the unfairly competing news agency, and that on such an issue of unfair competition in business a pirating "competitor who is misappropriating it [such news] for the purpose of disposing of it to his own profit and to the disadvantage of complainant cannot be

---

[1] No opinion filed.

heard to say that it is too fugitive or evanescent to be regarded as property." By fair construction, it is not thought that a majority of the court in the cited case meant to hold that in all cases, for all purposes, the complainant there had an absolute property right in the news reports, and this court is of the opinion that, as against this defendant radio station, the complainant here has no property right for any time whatever in the questioned news reports after they are published.

On the question of unfair competition, the International News Service Case is not controlling here, because the rule of that case is confined to the peculiar facts there involved and they, are unlike the facts here. In that case a majority of the court held there was unfair competition between plaintiff and defendant, both of whom were news agencies engaged for profit in gathering and distributing news reports to their respective contract members. In the case at bar, the defendant is not in any way pirating the news reports furnished by the complainant for the purpose of selling them or distributing them for profit to radio news broadcasters or other news publishers. The fact that, in so far as disseminating news is concerned, the defendant radio station may be performing a service similar to that of member newspapers of the complainant, does not necessarily of itself constitute the defendant a competitor even of a member newspaper of the complainant, because the member newspaper disseminates news for profit through sale of newspapers, while the defendant radio station receives no compensation for disseminating news to the public, but does so free of charge therefor. Complainant contends that the news broadcast service is maintained by defendant radio station in order to make its time allocated to advertising service more valuable to advertisers through building up a broader field for effective advertising; and that, similarly, the field of effective advertising through complainant's member newspapers is broadened by extending the field of newspaper distribution. A newspaper publisher gets paid not only for the advertising space in his newspaper purchased by advertisers, but also for each particular copy of his newspapers distributed to the public. The defendant radio station is not, therefore, directly in competition with complainant's member newspapers in respect to the business of disseminating news for profit. The mere fact that the defendant radio station competes for business profit with complainant's member newspapers in the advertising field does not make of the defendant and such newspapers competitors for business profits in the dissemination of news. Nor can it rightly be said that the taking or pirating by defendant, from complainant's members' newspaper issues regularly distributed and dedicated to the information of the public, of news reports and the broadcasting by defendant of such reports over its station to its radio listeners, without compensation or direct profit therefor, constitute unfair competition by defendant with the business of news gathering and dissemination for profit by complainant or its member newspapers. In this connection it is pertinent to note the language of the majority opinion in the International News Service Case, at pages 239, 240 of 248 U. S., 39 S. Ct. 68, 72 of the report of that case, as follows: "The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with complainant—which is what defendant has done and seeks to justify—is a very different matter. * * * Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business." But as above pointed out, defendant here disseminates the questioned news reports to its listeners gratuitously and without profit, and for that reason complainant's case against the defendant on the facts here must, in so far as the same is based on the rule of the cited case, fail. The rule of the majority of the Supreme Court in the cited case relied upon by complainant does not, on the question of unfair competition, apply to the facts in the case at bar.

Complainant also brings forth in its behalf the case of The Associated Press v. Sioux Falls Broadcast Association,[1] decided by

---

[1] No opinion filed.

Judge Jas. D. Elliott of the United States District Court of South Dakota at Sioux Falls, on March 4, 1933, being cause No. 377, S. D. Eq. This court has not had access to the opinion of Judge Elliott in that case, but from a certified copy of the findings and conclusions in the case it appears that the facts involved in it are substantially on all fours with the facts in the case at bar. It is argued that Judge Elliott considered the rule of International News Service v. Associated Press, supra, applicable and controlling in the case before him; but, if Judge Elliott entertained that view, this court finds itself respectfully unable to concur in Judge Elliott's interpretation and application of the law.

Complainant has cited other authorities reviewed by the court, but, without mentioning them all, it seems that the more important of them involve unlicensed use by the defendants of market or trade quotations or trade information compiled through special skill or inventive labor, and generally distributed not to the public at large, but only under contract to trade members. In the case at bar, no special skill or inventive labor is involved.

The case of Tribune Co. v. Associated Press (C. C.) 116 F. 126; the dissenting opinions of Justices Holmes and Brandeis in International News Service v. Associated Press, supra; the opinion of Circuit Judge L. Hand in Cheney Bros. v. Doris Silk Corporation (C. C. A.) 35 F.(2d) 279; and the reasoning of the court in the German case reviewed in Journal of Air Law, 1931, vol. II, p. 63, all announced principles more clearly applicable to the facts here involved.

■ Complainant, on page 26 of its brief, cites the Communications Act of 1934, title 47 U. S. Code Anno., § 605, and quotes therefrom as follows: "And no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto"; and complainant argues that the German case cited by defendant, which refused to protect a radio broadcaster from pirating of its news by a newspaper, could not apply to the case at bar by reason of the provisions of the cited Communications Act (47 USCA § 151 et seq.); but that statute specifically applies only to communications by wire or radio and does not apply to communications published in a newspaper. The German case, therefore, holding that the radio broadcaster has no right in news which can be protected after the news has been broadcast by radio to the public, may at least be said to indicate the modern trend and to point out the policy of a leading European country in protecting the public interest in news and in denying private business claims thereto from the moment the news is first dedicated to the use of the public, and, in so far as the principles announced therein apply to similar acts not controlled by specific law or authority, the German case is worthy of appropriate consideration here in the absence of other controlling authority to the contrary. The facts in that case are more nearly analogous to the facts in the case at bar than are those stated in any other cited case except the South Dakota case.

■ This court holds that when general news furnished by complainant, or local news claimed to be under its control as regards republication, has been printed in a regular issue of complainant's member newspapers and that issue has been, in the ordinary course, published and distributed to the public, such news reports from that moment belong to the public, including the defendant and all others who may desire to use them, for all purposes except for sale by a rival news agency to its news publishing members, and that the mere fact that defendant disseminates gratuitously those news reports as a part of its radio service, after they have been so received by defendant contemporaneously with other members of the public, does not prevent defendant from so receiving and using such news reports, since such practice by defendant does not involve the pirating by one news gathering and distributing agency of news reports of another such agency, as was the case in International News Service v. Associated Press, supra.

■ Another very important phase of this case is that disclosing the everlasting conflict between private enterprise and public interest. The case occasions restatement of the principle that improved instrumentalities for the advancement of social progress and public convenience, including agencies for improved free speech and free press, must not be discarded for the sake of private enterprise, unless such hindrance of the public interest be required by positive law or clear contract. To refuse the interpretation of its

288

rights desired by complainant may, as contended, result in incidental financial loss to it, but, in the absence of law or contract, it is in this situation for Congress alone to abridge the public interest in favor of complainant's private enterprise; but Congress so far, even after giving the subject specific consideration in the past, has failed to take any action in the premises.

The relative positions of complainant and defendant in the communication of news may be better understood by recalling to view the history of the important phases of our development in the fields of transportation and communication. In the earliest period of our country's history, communication of private dispatches and public news was by individual courier on foot or, like Paul Revere, on horseback. Later came the stagecoach with the mails, always pressing onward to new frontiers. Next, the locomotive, or, as originally known, the "iron horse," developed the mail express, soon, however, yielding a portion of its communications business to the telegraph and telephone, and later yielding much of its business to its present aggressive competitors, the motorbus, motortruck, and airplane. In many instances, electric street railways have been forced out of business by the more convenient and efficient motorbus.

These improvements and developments have occurred in the field of news communication as well as in transportation, and have facilitated and have been indispensable to the march of progress in which the public has been most vitally interested, and, in respect to them, the protection of private investment has had to yield to the convenience of the public. A fair construction of the true situation in the case at bar is that it involves an exemplification of the greater efficiency of modern news dissemination instrumentalities as compared with those of bygone days, which, in those days, adequately served alike private enterprise and public interest. Complainant's and its newspaper member's facilities are not likely to pass into disuse as some news communication instrumentalities have in the past, but the service which complainant's facilities have rendered to the past or may render to the future cannot be employed to hinder the use of more modern means, including those of the defendant radio station, which, in some respects, surpass complainant's facilities to an extent comparable to the advantages of the airplane over those of the railroad train.

■ Accordingly, the proper protection of complainant's business, news service con-

tracts, and invested capital cannot justify withholding from the public the more speedy and more extensive dissemination of news through the improved instrumentalities of defendant radio station and others similarly situated, even when news reports broadcast by defendant or others gratuitously to their radio listeners have been taken from sources originated or controlled by complainant, if the reports have already been dedicated to the information of the public in a publicly distributed issue of complainant's member newspaper, unless such dissemination is in violation of some clear contract between complainant and defendant or complainant's member newspapers, or in violation of some positive law or well-defined general rule of conduct. This court is advised of no such positive law, contract, or rule of conduct, applicable to the facts here; and upon the foregoing considerations of fact and law the court concludes that the bill states no cause of action in equity nor any facts entitling complainant to the injunctive relief now sought.

The temporary restraining order will be dissolved, the defendant must be discharged from the show cause order, and the temporary injunction will be denied. As in the court's view the bill cannot in any event succeed, it must be dismissed. Counsel may propose appropriate form of order.