# E. W. BLISS COMPANY *v.* UNITED STATES.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 15.   Argued November 20, 21, 1918.—Decided December 9, 1918.

In a contract for supplying torpedoes, the manufacturer agreed with the Government not to make use of any device the design for which was furnished to it by the United States, in torpedoes constructed for other persons or governments, and not to disclose such devices, but no device or design was to come within the prohibition unless so designated in writing by the Government at the time when it was conveyed to the manufacturer.

*Held:* (1) That the obligation to secrecy was not confined to devices which were secret, or to inventions by the United States, but extended to such as were furnished—communicated with certainty—, and designated for secrecy, by the United States, even where the design was subsequently worked out by employees of the manufacturer.   Pp. 43–48.

(2) That injunction against disclosure should be confined to devices in use, but without prejudice to the right of the Government to enjoin disclosure of others, upon proof of intention to make use of them.   P. 48.

Davison patent relating to propulsion of torpedoes construed.   P. 44.
224 Fed. Rep. 325; 229 Fed. Rep. 376, modified and affirmed.

THE case is stated in the opinion.

*Mr. George W. Field*, with whom *Mr. Frank H. Platt* and *Mr. Eli J. Blair* were on the briefs, for appellant:

To furnish a design, it is necessary to furnish something concrete. So of a device. One cannot exhibit an idea. A device has been defined as a thing "devised or formed by design; a contrivance; an invention." "Device" meant some contrivance which could be installed in the torpedo.

The Government has published by the Davison patent and otherwise the nature of the balanced turbine and has therefore waived secrecy. This clause must be construed against the Government because drawn by it. Further, it is a restriction on the defendant's power of alienation of its own property.

It should be construed to avoid absurdity or unfair advantage to one party over the other. *Bell* v. *Bruen*, 1 How. 169; *Sanford* v. *Brown Brothers Co.*, 208 N. Y. 90.

The balanced turbine principle being public property, the Government could not furnish it to the defendant.

The purpose was to prevent knowledge of new inventions going to the other nations. By the issuance of patents, both domestic and foreign, this purpose is frustrated by the plaintiff itself.

As no irreparable injury can be suffered by repetition of such knowledge, injunction was improper.

The position of the defendant is analogous to that of the holder of a trade secret. Once a trade secret has become generally known, regardless of the contract between the parties, its further promulgation will not be protected by injunction. *Bell & Bogart Soap Co.* v. *Petrolia Mfg. Co.*, 25 Misc. (N. Y.) 66; *National Tube Co.* v. *Eastern Tube Co.*, 23 Ohio C. C. 468; *Chain Belt Co.* v. *Von Spreckelsen*, 117 Wisconsin, 106.

*Mr. Assistant to the Attorney General Todd*, with whom *Mr. A. F. Myers* was on the brief, for the United States.

MR. JUSTICE McKENNA delivered the opinion of the court.

Appeal from a decree of the United States Circuit Court of Appeals amending and affirming a decree of the District Court for the Eastern District of New York entered in a suit brought by the United States against appellant (herein referred to as the Bliss Company) restraining the latter from exhibiting or communicating the construction and operation of a torpedo known as the Bliss-Leavitt torpedo.

The controversy turns upon the construction and application of certain clauses of the contracts between the Bliss Company and the United States and is not, we think, in broad compass. In support of its contention in the main the United States has the sanction of the two courts.

The development, construction and operation of the torpedo gave animation and attraction to the argument, but it is enough to say that its method of propulsion is the balanced turbine method, so called, that is, turbines revolving in opposite directions. The United States asserts that to this method of propulsion the excellence and efficacy of the torpedo is due and that it was the conception of the United States; that it was the result of much experimentation on the part of its engineers and those of the Bliss Company and the expenditure of substantial sums of money by the Government, and that because of the superior speed, range and power of this new weapon, other nations have been eager to learn the secrets of its construction.

The Bliss Company denies these assertions, opposes them, besides, by the contentions that the balancing of rotary bodies analogous to turbines rotating in opposite directions was a matter of common knowledge long prior to any transactions with the United States and that the

torpedoes constructed by it under its contract contained balanced turbines, so called, of its own design and property; or, to quote counsel: "The torpedo is the product of the assiduity and genius of the defendant's officers and engineers, and not that of the Government." And, further, that it purchased from Lieutenant Davison, with full knowledge of the United States, all of his rights to foreign patents, and to this patent, it is said, the United States assigns a special excellence. This is the issue in outline. The Bliss Company asserts the right to have other customers than the United States and to seek other markets, and not subject to restriction by the United States. The United States claims an exclusive service and even concealment from all others except as it may concede it. The resolution of the contentions is in the contract of the parties.

Their transactions date to 1905 and are exhibited in three contracts, one of November 22, 1905, one of June 12, 1912, and an intervening one dated June 16, 1909. In the 1905 contract there was a provision which it is admitted was embodied in all subsequent contracts. Disputes arose as to the meaning of the provision, the rights and restraints under it, and the Bliss Company brought them to litigation by expressing its desire to negotiate with Messrs. Whitehead & Company for the right to manufacture the torpedo in foreign countries. The Bureau of Ordnance objected, and on May 9, 1913, the company addressed the Secretary of the Navy as follows: "As a means to this end we notify you hereby that it is our intention to communicate the complete construction and operation of the existing type of Bliss-Leavitt torpedo, and to make a demonstration of the operation of said torpedo, to a representative of Messrs. Whitehead and Company on or immediately after June 1, 1913."

To restrain the threatened action this suit was brought. The prayer of the bill covers the balanced turbine and

certain other features, and it is manifest that whether it should be granted depends particularly upon a provision of the contract which prohibits the exhibition of the torpedo or its performance to any person whatsoever or to any other government, or its representatives, than that of the United States. That provision is that the Bliss Company "will not make use of any device the design for which is furnished to it" by the United States "in any torpedo constructed or to be constructed for any person or persons, firms, corporations, or others, or for other governments than" the United States and "will not exhibit such device or in any way describe it to or give any information in regard to it to any person . . . or to other governments, or their representatives" or exhibit its performance "either in shop or in service tests." A violation of the contract incurs its cancellation and releases the United States from all claims or demands under it. It is, however, provided that no design shall be considered as coming within the provisions unless the United States communicates in writing to the Bliss Company that it (the United States) thinks it is embraced by the provision.[1] It is disputed whether the condition of the pro-

---

[1] "Nineteenth. It is hereby expressly further stipulated, covenanted, and agreed, that the party of the first part will not make use of any device the design for which is furnished to it by the party of the second part in any torpedo constructed or to be constructed for any person or persons, firms, corporations, or others, or for other governments than the party of the second part hereto; that the party of the first part will not exhibit such device or in any way describe it to or give any information in regard to it to any person or persons, firms, corporations, or others, or to other governments, or their representatives, than the party of the second part hereto; that the party of the first part will not exhibit the performance of any torpedo containing such device, either in shop or in service tests, to any person or persons, firms, corporations, or others, or to other governments, or their representatives, than the party of the second part hereto:

*       *       *       *       *       *       *       *

"Provided furthermore, That no device or design shall be considered

vision was performed, but both the lower courts have found that it was, and we concur in their judgment. The condition of the provision, then, having been per-. formed, we come to its. meaning, the Bliss Company contending that the device must be of the invention of the United States, and the latter contending that it need only be "furnished" by the United States.

The Bliss Company's contention in its detail is some-what difficult to state concisely. It rests as much in implication as in expression. It is said that the restrictive clause "applies only to a 'device the design for which is furnished by the Government'" and "expressly and clearly excludes ideas, methods or principles.". And: it is further urged that "to furnish a design, it is necessary to furnish something concrete. A device also is something

---

as coming within the provisions of this clause unless the party of the second part shall state to the party of the first part in writing, at the time when the said device or design is itself conveyed to the party of the first part by written communication from the party of the second part, that the party of the second part considers that the said device or design is embraced within the provisions of this clause."

In the contract of June 12, 1912, the foregoing clause became clause Twentieth. The 1912 contract contained, however, in the second clause, the following new matter, which (save that part enclosed by brackets) had not been included in previous contracts:

"[Second. The manufacture of said torpedoes] (the word 'torpe-does' as used throughout this contract being intended to include every-thing covered by the drawings, plans, and specifications above referred to) [shall conform in all respects to and with said drawings, plans and specifications], including duly authorized changes therein, but said drawings, plans and specifications are not hereto annexed or made a part hereof. They contain information of a confidential character that can not be made public without detriment to the Government's and the contractor's interests, and they are to be treated as confidential by the parties to this contract, it being understood, however, that noth-ing in this clause shall be construed as depriving the party of the first part of the right to make and sell such torpedoes to any other party or government whatsoever, except as limited by clause twentieth of this contract."

concrete. One cannot exhibit an idea." To support these declarations legal and other definitions are adduced. One is selected from *Armour Packing Co.* v. *United States,* 209 U. S. 56, which explains a device to be a thing "devised or formed by design; a contrivance; an invention." It is hence asserted that the United States did not comply with these definitional requirements—indeed, from the state of the art, could not; and therefore could not impose secrecy upon the Bliss Company.

The tangibility of the definitions and the arguments based upon them are not very clear nor what purpose they tend to establish. The company asserts a right to employ the principle of propulsion and this principle it asserts to be—to quote counsel—"the balancing of rotary bodies analogous to turbines rotating in opposite directions and of equal speeds for the purpose of eliminating gyroscopic effect," and that it was "long prior to 1906 [the first contract was made in 1905] a matter of common knowledge and known to the defendant" (the company); and again, "The balanced turbine principle was public property and not the property of the Government. It was a matter of public knowledge and not a secret." Therefore, as we have said, the contention is that it was not within the prohibition of the contracts. Immediately it may be asked: This being the condition, of what value was the restrictive clause to the Government? Surely the Government sought to secure something valuable and practical, and yet it was apparently only the promise of words never to have effective realization. Instead of security the Government got a controversy. Anything it might offer or suggest or, to use the word of the contract, "furnished," would be open to dispute and the charge of being anticipated, already in existence among the things available to the company as "public property and not the property of the Government" —"a matter of public knowledge and not a secret." And the Govern-

ment could not even fortify itself by the presumptions of a patent. To have done so would have been to break the seal of secrecy and relieve the company from the obligations imposed by the contract. To this contention the Bliss Company is driven to get rid of the Davison patent, the design for which was furnished the company by the United States. Counsel say: "Assuming that the particular design of a balanced turbine produced by Davison was a secret, it lost every attribute of a secret upon the issuance by the United States Government of letters patent to Davison." And further: "The issuance of this patent, therefore, became an act of the Navy Department. Thus, the Government through the same department by which it entered into the several contracts with the defendant [the company], caused the alleged secret of the balanced turbine to be laid open to the public." And, besides, it is said that the Government "tacitly permitted Davison, one of its officers and subject to its discipline, to assign" to the company "foreign patents for the device in issue"; and that therefore "it cannot now successfully contend that its design is within the restrictive clause." But this gives an exaggerated effect of publicity to a patent and cannot dispense with the explicit obligation of the restrictive clause. Indeed, we may repeat, Of what avail was the restrictive clause to the Government under the contentions of the company? It was assured of nothing but opposition and litigation. We may cite in further illustration of this that the Bliss Company asserts that the Davison device was without novelty in the field of "opposite revolving turbines" (another name for a balanced turbine) and that all he did was to take a "design of unbalanced turbine shown" in a prior patent "and reverse one of the turbine wheels with the incidental and necessary change in the gearing." The assertion is that "the designing of this gearing is what occupied Lieutenant Davison's time and thought." We

may say that we concur with the lower courts and think the patent is not so limited. The Bliss Company thought well enough of it to buy its foreign rights.

. The several contentions of the company are but fragments of the broader one that there were in the world's knowledge and available to the company practical devices as well as principles of operation which precluded a demand of secrecy by the Government and which left the company free to use or exhibit or sell to anybody torpedoes embodying them, the final and dominant contention being that the Government's reservation was only of inventions—inventions, however, undisclosed, patentable but not patented. Yet the word of the contract is "furnished," not invented, and the words are of different significance. To invent means to create; to furnish means to supply. And the difference was too important, too pertinent to the purpose to have been overlooked—indeed, must have been deliberately contemplated to achieve the object of the parties. The Government in its situation, considering the use of torpedoes and the uncertainty against whom to be used, would want to avail itself of the whole universe of things then existing or that might be brought into existence, in whatever way or combination it could. It is easy to believe that an arrangement of old devices might have value. And secrecy was an especial object, as far as it could be maintained and for such length of time as it could be maintained. The fact and the time might in instances be critical and determinative of a decisive result. The Government considered the provision important to insert in the contract of 1905 and to repeat in every subsequent contract, to and including that of 1912, and to disregard the plea of the company for some relaxation of it to accommodate the company's interests. There was some relaxation in 1912 and 1913, but the confidential relation of the parties was emphasized as we have seen.

This was the simple situation. It is free from the tangle and perplexities of the company's contentions. It gives use to the restrictive clause, directness of right and remedy, not dependent upon explorations into the prior art or the delays and termination of law suits. These observations apply to other parts of the torpedo as well as to the balanced turbine. The remarks of the Circuit Court of Appeals are pertinent. The court said:

"Throughout the entire record, in the contracts, correspondence and dealings of the parties, the importance of secrecy is everywhere manifest. The nature of the services rendered was such that secrecy might almost be implied. It is difficult to imagine a nation giving to one of its citizens contracts to manufacture implements necessary to the national defense and permitting that citizen to disclose the construction of such implement or sell it to another nation. The very nature of the service makes the construction urged by the defendant untenable. We are of the opinion, therefore, that the injunction should include all designs, drawings, plans and specifications used by the defendant in making the Bliss-Leavitt torpedo for the Government which were approved by the Ordnance Bureau, notice of which was given to the Bliss Company pursuant to the provisions of Clauses 19 and 20 of the contracts in question." The court hence directed the amendment of the decree of the District Court, "adding such a provision."

A rehearing was asked of the case. It was denied as to the balanced turbine and granted as to the other devices, that is, Double Regulation of Air, Ball Bearings for Gyroscope, and Inside Superheater. To the inclusion of these in the decree it is objected, as to the Double Regulation of Air, that written notice was not given the company as required by the restrictive clause. The assertion is that what was done by the Government was

nothing but suggestions, first verbal, and then by letter, but not accompanied by "blue prints of design." [1] The objection is based on the contention already referred to that a device or design must be something concrete or, it is now said, if not that, "it at least imports something as to dimensions, size, shape, weight, etc., from which a device could be constructed." The objection

---

[1] Bureau of Ordnance
Navy Department

25698/102–(G)–O.                         January 18, 1913.

Sirs: 1. The Bureau is pleased to note the decided improvement shown in the dynamometer tests of the Mark VII torpedo by the use of double regulating valves.

2. This plan or idea of double regulation was first submitted to the Bureau by a letter from Lieut. E. Frederick, then Assistant Inspector of Ordnance at your works, dated March 9, 1911, which was received and filed in this office on or about March 15, 1911, and the value of the invention was successfully established by the actual tests at the Naval Torpedo Station, Newport, R. I.

3. The Bliss Company had been furnished verbally with the idea and the fact that its value had been established by actual trials. This was also furnished the E. W. Bliss Company by the Bureau's letter No. 25698/92 (G) of January 4, 1913.

4. In view of the above the Bureau requests that you will note for record that the double regulating principle has been submitted by the Bureau, and that this principle of any device embodying the same falls under the provisions of Clause 20 of the contracts now existing.

5. While the Bureau has no actual blue prints of design it has on record cards and certain data obtained by experiments at the Torpedo Station which the Bureau will be pleased to furnish the E. W. Bliss Company for their information if they so desire and will request it.

6. The Bureau again desires to express its pleasure in noting the improvement in the dynamometer tests due to the double regulation and the change in angle spray which was introduced at the suggestion of the Bureau's inspectors at your works.

Respectfully,

N. C. TWINING,
*Chief of Bureau.*

E. W. Bliss Co., Brooklyn, N. Y.
(Through Inspector of Ordnance.)

is hypercritical and we are somewhat surprised at it. There was no uncertainty in the Government's demand and no misunderstanding of it. There were discussions concerning the practical means of using it, and it was testified that "the sole question practically reducing itself to whether or not they had sufficient space to apply this design or principle." And the design was subsequently worked out by the employees of the company. The objection was rested on other grounds, and it was rightfully dealt with by the Circuit Court of Appeals.

The same objection is not made as to the Superheater and the Ball Bearings. It is said of them that they are not used in the existing type of torpedo. As this is conceded by the Government, and as we do not agree with its assertion that the company "displays a disposition to violate its trust whenever it seems advantageous to do so," we think the decree should not include the devices. In other words, it should be modified to exclude them, without prejudice, however, to the Government's right to obtain an injunction against their disclosure, upon proper proof of an intention to use the devices, in proceedings supplemental to this action or in an independent action. *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U. S. 229, 262.

The decree is modified as stated, and, as modified, affirmed.

*Affirmed.*

THE CHIEF JUSTICE dissents.

MR. JUSTICE McREYNOLDS took no part in the consideration or decision of the case.