UNITED STATES of America,
Appellee,

v.

Victor L. MARCHETTI, Appellant,
(two cases).

Nos. 72–1586, 72–1589.

United States Court of Appeals,
Fourth Circuit.

Argued May 31, 1972.

Decided Sept. 11, 1972.

Certiorari Denied Dec. 11, 1972.
See 93 S.Ct. 553.

Melvin L. Wulf, New York City (Sanford Jay Rosen, John Shattuck, New York City, American Civil Liberties Union Foundation, and Philip J. Hirschkop, Alexandria, Va., on brief), for appellant.

Irwin Goldbloom, Atty., Dept. of Justice, (Harlington Wood, Jr., Asst. Atty. Gen., Walter H. Fleischer, and Daniel J. McAuliffe, Attys., Dept. of Justice, on brief), for appellee.

(Irwin Karp and Osmond K. Fraenkel, New York City, on brief), for The Authors League of America, Inc., amicus curiae.

(Edward C. Wallace, Marshall C. Berger, Heather Grant Florence, and Weil, Gotshal & Manges, New York City, on brief), for Association of American Publishers, Inc., amicus curiae.

Before HAYNSWORTH, Chief Judge, and WINTER and CRAVEN, Circuit Judges.

HAYNSWORTH, Chief Judge:

The question for decision is the enforceability of a secrecy agreement exacted by the government, in its capacity as employer, from an employee of the Central Intelligence Agency. Marchetti contends that his First Amendment rights foreclose any prior restraint upon him in carrying out his purpose to write and publish what he pleases about the Agency and its operations. Relying on a secrecy agreement signed by Marchetti when he became an employee of the Agency and on a secrecy oath signed by Marchetti when he resigned from the Agency, the District Court ordered Marchetti to submit to the Agency thirty days in advance of release to any person or corporation, any writing, fictional or non-fictional, relating to the Agency or to intelligence and ordering him not to release any writing relating to the Agency or to intelligence without prior authorization from the Director of Central Intelligence or from his designated representative. Marchetti was also ordered to return any writing or other property of the United States he had acquired while employed by the Agency.

We affirm the substance of the decision below, limiting the order, however to the language of the secrecy agreement Marchetti signed when he joined the Agency. We find the contract constitutional and otherwise reasonable and lawful.

This action was initiated on April 18, 1972, when the United States was granted an ex parte temporary restraining order against Marchetti by the District Court. A hearing was set for April 28, 1972, on the Government's motion for a preliminary injunction. On April 21, 1972, Marchetti moved to have the District Court dissolve the temporary restraining order. After that motion had been denied, an interlocutory appeal pursuant to 28 U.S.C. § 1292(b) was sought in this court. After oral argument, this

panel denied the request for an interlocutory appeal and for writs of mandamus and prohibition, but directed the United States not to interfere with prospective witnesses for Marchetti. Counsel for Marchetti subsequently sought a postponement until May 14, 1972 of the hearing on the preliminary injunction. In granting this postponement, the District Court ordered the trial on the merits consolidated with the hearing on the motion for the preliminary injunction. The trial, held on May 15, was followed on May 19, 1972 by the District Court's Memorandum Opinion and Order granting the injunction sought by the United States.

I. The relevant provisions of the agreement are:

"SECRECY AGREEMENT

1. I, Victor L. Marchetti, understand that by virtue of my duties in the Central Intelligence Agency, I may be or have been the recipient of information and intelligence which concerns the present and future security of the United States. This information and intelligence, together with the methods of collecting and handling it, are classified according to security standards set by the United States Government. I have read and understand the provisions of the espionage laws, Act of June 25, 1948, as amended, concerning the disclosure of information relating to the National Defense and I am familiar with the penalties provided for violation thereof.

2. I acknowledge, that I do not now, nor shall I ever possess any right, interest, title or claim, in or to any of the information or intelligence or any method of collecting or handling it, which has come or shall come to my attention by virtue of my connection with the Central Intelligence Agency, but shall always recognize the property right of the United States of America, in and to such matters.

"3. I do solemnly swear that I will never divulge, publish or reveal either by word, conduct, or by any other means, any classified information, intelligence or knowledge except in the performance of my official duties and in accordance with the laws of the United States, unless specifically authorized in writing, in each case, by the Director of Central Intelligence or his authorized representatives. * * *"

Marchetti was an employee of the Central Intelligence Agency from October 3, 1955 until he resigned effective September 5, 1969. The positions he held included the post of Executive Assistant to the Deputy Director. When he joined the Agency, he signed a secrecy agreement promising not to divulge in any way any classified information, intelligence or knowledge, except in the performance of his official duties, unless specifically authorized in writing by the Director or his authorized representative.[1] Marchetti also signed a secrecy oath when he resigned from the Agency in 1969.[2]

2. The relevant provisions of the oath are:

"SECRECY OATH

I, _____, am about to terminate my association with the Central Intelligence Agency. I realize that, by virtue of my duties with that Agency, I have been the recipient of information and intelligence which concerns the present and future security of the United States of America. I am aware that the unauthorized disclosure of such information is prohibited by the Espionage Laws (18 USC secs. 793 and 794), and by the National Security Act of 1947 which specifically requires the protection of intelligence sources and methods from unauthorized disclosure. Accordingly, I SOLEMNLY SWEAR, WITHOUT MENTAL RESERVATION OR PURPOSE OF EVASION, AND IN THE ABSENCE OF DURESS, AS FOLLOWS:

1. I will never divulge, publish, or reveal by writing, word, conduct, or otherwise, any information relating to the national defense and security and particularly information of this nature relating to intelligence sources, methods and operations, and specifically Central Intelligence Agency operations, sources, methods, personnel, fiscal data, or security measures to anyone, including but not limited to, any future governmental or private employer, private citizen, or other Government employee or official without the express written consent of the Director of Central Intelligence or his authorized representative.

* * * * *

3. I do not have any documents or materials in my possession, classified or unclassified, which are the property of, or in custodial responsibility of the

After his resignation, Marchetti published a novel, entitled *The Rope Dancer* concerning an agency called the "National Intelligence Agency." Marchetti has also published an article in the April 3, 1972 issue of the magazine, The Nation. Entitled "CIA: The President's Loyal Tool," the article criticized some policies and practices of the Agency. In March, 1972, Marchetti submitted to Esquire magazine and to six other publishers an article in which he reports some of his experiences as an agent. According to the United States, this article contains classified information concerning intelligence sources, methods and operations. Marchetti has appeared on television and radio shows and has given interviews to the press. He has submitted to a publishing house an outline of a book he proposes to write about his intelligence experiences.

## I

### *Jurisdiction*

 Jurisdiction arises from the presence of the United States as a party. 28 U.S.C. § 1345. "The government can sue even if there is no specific authorization. In such cases, however, it must have some interest to be vindicated sufficient to give it standing." C. A Wright, Federal Courts 68 (2d ed. 1970), ch. 3, § 22. Standing arises from the government's interest in protecting the national security.[3]

## II

### *The Freedom of Speech and of the Press are not Absolute*

Marchetti claims that the present injunction is barred by the Supreme Court

decision in the Pentagon Papers case because the Government has failed to meet the very heavy burden against any system of prior restraints on expression. New York Times Co. v. United States, 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L. Ed.2d 822.

 We readily agree with Marchetti that the First Amendment limits the extent to which the United States, contractually or otherwise, may impose secrecy requirements upon its employees and enforce them with a system of prior censorship. It precludes such restraints with respect to information which is unclassified or officially disclosed, but we are here concerned with secret information touching upon the national defense and the conduct of foreign affairs, acquired by Marchetti while in a position of trust and confidence and contractually bound to respect it.

In order to protect freedom of speech and of the press, the First Amendment has been applied beyond its express terms, which were directed solely to Congress:

> "The first amendment provides that 'Congress shall make no law * * * abridging the freedom * * * of the press,' and there has been common disposition to apply the amendment to the Executive and the courts as well. [Citing: Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 143 [–144, 71 SCt. 624, 95 L.Ed. 817] (Black, J., concurring), 199 [, 71 S.Ct. 624] (Reed, J., dissenting) (1951); Watkins v. United States, 354 U.S. 178, 188 [, 77 S.Ct. 1173, 1 L.Ed.2d 1273] (1957); West Virginia [State] Bd. of Educ. v. Barnette, 319 U.S.

Central Intelligence Agency, having come into my possession as a result of my duties with the Central Intelligence Agency, or otherwise. * * * "

3. Cf. In re Debs, 158 U.S. 564, 584, 15 S.Ct. 900, 906, 39 L.Ed. 1092, 1102:
"Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a

right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court."

624, 642 [, 63 S.Ct. 1178, 87 L.Ed. 1628] (1943). *See also* Beauharnais v. Illinois, 343 U.S. 250, 386 [, 72 S. Ct. 725, 96 L.Ed. 919] (Douglas, J., dissenting) (1952); Reid v. Covert, 354 U.S. 1, 17 [, 77 S.Ct. 1222, 1 L. Ed.2d 1148] (1957).] But the import of the first amendment is as uncertain and undefined in regard to the freedom of the Press as to the other rights and freedoms that it protects, and, indeed, the courts have had far fewer occasions to define the freedom of the Press, than, say, freedom of speech." Henkin, The Right to Know and the Duty to Withhold: The Case of the Pentagon Papers, 120 U.Pa.L. Rev. 271, 277 (1971).

Nonetheless, "[f]ree speech is not so absolute or irrational a conception as to imply paralysis of the means for effective protection of all the freedoms secured by the Bill of Rights." Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (Frankfurter, J., dissenting).[4] In applying the First Amendment to actions taken by the judicial and executive branches, the Supreme Court has followed a flexible approach. As Mr. Justice Brennan wrote in Roth v. United States, 354 U.S. 476, 483, 77 S. Ct. 1304, 1308, 1 L.Ed.2d 1498, 1506:

"[I]t is apparent that the unconditional phrasing of the First Amendment was not intended to protect every utterance. This phrasing did not prevent this Court from concluding that libelous utterances are not within the area of constitutionally protected speech. Beauharnais v. Ill., 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919. At the time of the adoption of the First Amendment, obscenity law was not as fully developed as libel law, but there is sufficiently contemporaneous evidence to show that obscenity, too, was outside the protection intended for speech and press."

Threats and bribes are not protected simply because they are written or spoken; extortion is a crime although it is verbal. The Supreme Court has also upheld the Labor Board's attempt to protect employees from spoken coercion by employers. NLRB v. Gissel Packing Co., 395 U.S. 575, 616–619, 89 S.Ct. 1918, 23 L.Ed.2d 547. The "government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops." Near v. Minnesota, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357, 1367. Cf. Pennsylvania v. Nelson, 350 U.S. 497, 76 S. Ct. 477, 100 L.Ed. 640. This flexible approach toward the executive and judicial branch is warranted not only because they are omitted from the express language of the First Amendment, but also because they lack legislative capacity to establish a pervasive system of censorship. This case itself illustrates the point that the executive and judicial branches proceed on a case by case basis, the executive branch being dependent on the judiciary to restrict unwarranted disclosures.

An earlier case upholding a government request to enjoin publication involved the Valachi papers, written while Valachi was in prison. The United States brought an action to obtain a permanent injunction requiring Maas, the editor of Valachi's manuscript, to comply with a "Memorandum of Understanding" which required the approval

---

4. "Because freedom of public expression alone assures the unfolding of truth, it is indispensable to the democratic process. But even that freedom is not an absolute and is not predetermined. By a doctrinaire overstatement of its scope and by giving it an illusory absolute appearance, there is danger of thwarting the free choice and the responsibility of exercising it which are basic to a democratic society."

Bridges v. California, 314 U.S. 252, 293, 62 S.Ct. 190, 268, 86 L.Ed. 192, 219 (Frankfurter, J., dissenting). *See also* Near v. Minnesota, 283 U.S. 697, 708, 51 S.Ct. 625, 628, 75 L.Ed. 1357, 1363, "Liberty of speech, and of the press, is * * * not an absolute right, and the state may punish its abuse."

of the manuscript by the Department of Justice prior to publication or dissemination. The parties entered this agreement because the Attorney General had promulgated, pursuant to 18 U.S.C. §§ 4001, 4042, a regulation that no manuscript prepared by a federal prisoner should be approved for publication "if it deals with the life history or the criminal career of the writer." Valachi and his attorney had signed the Memorandum, but Maas had not, signing instead another agreement to which the Department of Justice was not a party. The District Court granted the United States a preliminary injunction which was upheld by the Court of Appeals based on the broad discretion of the District Court in considering preliminary injunctions. Maas v. United States, 125 U.S. App.D.C. 251, 371 F.2d 348.

This Court recently granted the government declaratory relief against a newspaper publisher who had published a racially discriminatory advertisement for the rental of a room in a private house, in violation of the 1968 Civil Rights Act. The Court denied the defendant's claim that freedom of the press was being abridged, concluding that the act affected the press only in a commercial context and not in the dissemination of ideas. United States v. Hunter, 4 Cir., 459 F.2d 205, 211–213.

### III

*The Government has a Right to Secrecy*

 Gathering intelligence information and the other activities of the Agency, including clandestine affairs against other nations, are all within the President's constitutional responsibility for the security of the Nation as the Chief Executive and as Commander in Chief of our Armed forces. Const., art. II, § 2. Citizens have the right to criticize the conduct of our foreign affairs, but the Government also has the right and the duty to strive for internal secrecy about the conduct of governmental affairs in areas in which disclosure may

reasonably be thought to be inconsistent with the national interest.

The Supreme Court recognized the need for secrecy in government in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 221, 81 L.Ed. 255, 263 where it said that the President

> "has his confidential sources of information. He has his agents in the form of diplomatic, consular and other officials. Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results."

A similar view was expressed in Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568, 576:

> "The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports are not and ought not to be published to the world."

In another case the government was granted an injunction to enforce an agreement with a private contractor who claimed the right to divulge the details of a torpedo to other potential customers. In E. W. Bliss Co. v. United States, 248 U.S. 37, 46, 39 S.Ct. 42, 45, 63 L.Ed. 112, 118, the Supreme Court quoted with approval from the opinion of the Second Circuit in that case:

> " 'The nature of the services rendered was such that secrecy might almost be implied. It is difficult to imagine a nation giving to one of its citizens contracts to manufacture implements necessary to the national defense and permitting that citizen to disclose the construction of such implement or sell it to another nation. The very nature of the service makes the construction urged by the defendant untenable.' "

 Although the First Amendment protects criticism of the government,

nothing in the Constitution requires the government to divulge information:

"From our national beginnings, the Government of the United States has asserted the right to conceal and, therefore, in practical effect not to let the people know. Secrecy governed the deliberations in Philadelphia in 1787. Some need for secrecy was expressly recognized in the Constitution: in providing for publication of a journal of each House of Congress, it excepted 'such parts as may in their judgment require secrecy.' The occasional need for secrecy underlay some of the dispositions of the Constitution: the power to conduct foreign relations was given to the Executive rather than to Congress, and a part in making treaties to the less numerous Senate rather than to the House. Presidents from Washington to Nixon have asserted 'executive privilege' to withhold information from Congress. And Congresses and congressional committees have recognized the 'right,' the propriety, the need for some executive nondisclosure, even to them: since 1791 Congress, in requesting reports from Executive Departments, has asked the State Department to report only what in the President's judgment was 'not incompatible with the public interest.' Modern Congresses have recognized the Executive's classification system and provided for its enforcement, to some extent by criminal penalties. The Supreme Court, too, has repeatedly recognized the need for some secrecy in executive activities. For its own part, Congress has often claimed the need to conceal: the Senate in particular (especially in executive session), and committees and subcommittees of both Houses, have often maintained secrecy. The courts, too, often insist on the confidentiality of deliberations in the jury room or in judicial chambers. The most confidential proceeding in all of government is probably the conference of the Justices of the Supreme Court." Henkin, The Right to Know and the Duty to Withhold: The Case of the Pentagon Papers, 120 U.Pa.L.Rev. 271, 273–74 (1971).[5]

## IV

### *Secrecy Agreements with Employees Provide a Reasonable Means for Government Agencies to Protect Internal Secrets*

■■■ Congress has imposed on the Director of Central Intelligence the responsibility for protecting intelligence sources and methods. 50 U.S.C. § 403(d)(3). In attempting to comply with this duty, the Agency requires its employees as a condition of employment to sign a secrecy agreement, and such agreements are entirely appropriate to a program in implementation of the congressional direction of secrecy. Marchetti, of course, could have refused to sign, but then he would not have been employed, and he would not have been given access to the classified information he may now want to broadcast.

Confidentiality inheres in the situation and the relationship of the parties. Since information highly sensitive to the conduct of foreign affairs and the national defense was involved, the law would probably imply a secrecy agreement had there been no formally expressed agreement, but it certainly lends a high degree of reasonableness to the contract in its protection of classified information from unauthorized disclosure.

■■■ Moreover, the Government's need for secrecy in this area lends justi-

---

5. *Cf.* 5 U.S.C. § 552(b)(1) exempting from mandatory disclosure under the Freedom of Information Act "matters * * * specifically required by Executive Order to be kept secret in the interest of national defense or foreign policy * * *." Executive Order 10501 has established a system of classifying documents as "Top Secret", "Secret" or "Classified" depending on the effect of disclosure on the national defense and the conduct of the nation's affairs.

fication to a system of prior restraint against disclosure by employees and former employees of classified information obtained during the course of employment. One may speculate that ordinary criminal sanctions might suffice to prevent unauthorized disclosure of such information, but the risk of harm from disclosure is so great and maintenance of the confidentiality of the information so necessary that greater and more positive assurance is warranted. Some prior restraints in some circumstances are approvable of course. See Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649.

## V

### Marchetti's Rights

As we have said, however, Marchetti by accepting employment with the CIA and by signing a secrecy agreement did not surrender his First Amendment right of free speech. The agreement is enforceable only because it is not a violation of those rights. We would decline enforcement of the secrecy oath signed when he left the employment of the CIA to the extent that it purports to prevent disclosure of unclassified information, for, to that extent, the oath would be in contravention of his First Amendment rights.[6]

Thus Marchetti retains the right to speak and write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain.

Because we are dealing with a prior restraint upon speech, we think that the CIA must act promptly to approve or disapprove any material which may be submitted to it by Marchetti. Undue delay would impair the reasonableness of the restraint, and that rea-

sonableness is to be maintained if the restraint is to be enforced. We should think that, in all events, the maximum period for responding after the submission of material for approval should not exceed thirty days.

Furthermore, since First Amendment rights are involved, we think Marchetti would be entitled to judicial review of any action by the CIA disapproving publication of the material. Some such review would seem essential to the enforcement of the prior restraint imposed upon Marchetti and other former employees. See Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed. 2d 649. Because of the sensitivity of the area and confidentiality of the relationship in which the information was obtained, however, we find no reason to impose the burden of obtaining judicial review upon the CIA. It ought to be on Marchetti.

Indeed, in most instances, there ought to be no practical reason for judicial review since, because of its limited nature, there would be only narrow areas for possible disagreement.

The Constitution in Article II § 2 confers broad powers upon the President in the conduct of relations with foreign states and in the conduct of the national defense. The CIA is one of the executive agencies whose activities are closely related to the conduct of foreign affairs and to the national defense. Its operations, generally, are an executive function beyond the control of the judicial power. If in the conduct of its operations the need for secrecy requires a system of classification of documents and information, the process of classification is part of the executive function beyond the scope of judicial review. See Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134; Zemel

---

6. There was no apparent consideration for the secrecy oath, so that it would be, generally, unenforceable on that ground. The oath has the support of the moral force underlying solemn oaths, but it added nothing to the Government's arsenal of legal rights in the context of this proceeding.

v. Rusk, 381 U.S. 1, 85 S.Ct. 1271, 14 L. Ed.2d 179.

There is a practical reason for avoidance of judicial review of secrecy classifications. The significance of one item of information may frequently depend upon knowledge of many other items of information. What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context. The courts, of course, are ill-equipped to become sufficiently steeped in foreign intelligence matters to serve effectively in the review of secrecy classifications in that area.

 Information, though classified, may have been publicly disclosed. If it has been, Marchetti should have as much right as anyone else to republish it. Rumor and speculation are not the equivalent of prior disclosure, however, and the presence of that kind of surmise should be no reason for avoidance of restraints upon confirmation from one in a position to know officially.

 The issues upon judicial review would seem to be simply whether or not the information was classified and, if so, whether or not, by prior disclosure, it had come into the public domain.

## VI

### Conclusion

For the stated reasons, our conclusion is that the secrecy agreement executed by Marchetti at the commencement of his employment was not in derogation of Marchetti's constitutional rights. Its provision for submission of material to the CIA for approval prior to publication is enforceable, provided the CIA acts promptly upon such submissions and withholds approval of publication only of information which is classified and which has not been placed in the public domain by prior disclosure.

Generally, therefore, we approve the injunctive order issued by the District Court. The case will be remanded, however, for the purpose of revising the order to limit its reach to classified information and for the conduct of such further proceedings as may be necessary if Marchetti contends that the CIA wrongfully withheld approval of the publication of any information under the standards we have laid down.

Affirmed and remanded.

CRAVEN, Circuit Judge (concurring):

I agree that "[t]he conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Oetjen v. Central Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726, 732 (1917).

I concur in the opinion of the court except for the statement that the classification of documents and information by the executive is not subject to judicial review. Because the national security may be involved and because of the expertise of the executive, I would resolve any doubt about the reasonableness of a classification in favor of the government. If the burden were put upon one who assails the classification, and surely it ought to be, much of the difficulty envisioned in the court's opinion would presumably disappear. Indeed, I would not object to a presumption of reasonableness, and a requirement that the assailant demonstrate by clear and convincing evidence that a classification is arbitrary and capricious before it may be invalidated.

But however difficult the adjudication of the reasonableness of a secrecy classification, I cannot subscribe to a flat rule that it may never be attempted. The "right to know" is in a period of gestation. I think that the people will increasingly insist upon knowing what their government is doing and that, because this knowledge is vital to govern-

ment by the people, the "right to know" will grow. I am not yet ready to foreclose any inquiry into whether or not secrecy classifications are reasonable. To protect those that are does not require that we also protect the frivolous and the absurd.

Other than my doubt about the insulation of a classification system from judicial review, I fully concur in the opinion of the court.