**AMERICAN LIBRARY ASSOCIATION, et al., Plaintiffs,**

v.

**Lincoln FAURER, Director, National Security Agency, Defendant.**

Civ. A. No. 84–481.

United States District Court, District of Columbia.

March 27, 1986.

Mark H. Lynch, Susan W. Shaffer, American Civil Liberties Union Foundation, Washington, D.C., Leonard Rubenstein, Virginia Civil Liberties Union, Washington, D.C., for plaintiffs.

Vincent Mr. Garvey, Alan L. Ferber, Civil Div., Dept. of Justice, Washington, D.C., for defendant.

## OPINION

JUNE L. GREEN, District Judge.

This matter is before the Court on defendant's motion to dismiss or in the alternative for summary judgment ("Defendant's Motion for Summary Judgment"); plaintiffs' motion for summary judgment; an *in camera* inspection of the classified affidavit of Mr. E. Rich, Deputy Director, National Security Agency; and the entire record herein. For the reasons below, the Court grants defendant's motion for summary judgment.

### I. *Background*

Plaintiffs, an historical researcher and several library and historical organizations,[1] filed the instant action for declaratory and injunctive relief, seeking access to 34 documents donated to the George C. Marshall Library ("Library") by William

Friedman, a former employee of the National Security Agency ("NSA"). The documents at issue include 31 now-classified pieces of private correspondence and three government publications.

The basic facts surrounding the donation of these disputed documents and the controversy arising from their withdrawal from public access are simple and uncontested. In 1969, Mr. William Friedman, a noted cryptologist who had worked for the NSA and its predecessor agencies, decided to donate his personal collection of letters, papers, and memorabilia ("Friedman Collection") to the Library. After his death in 1969, the Friedman Collection was transferred from his home to the George C. Marshall Library, located on the campus of the Virginia Military Institute in Lexington, Virginia. The Library maintains custody of the papers of certain former government officials.

Public access to the Friedman Collection, however, was not available until Ronald Clark, a biographer, published a biography of Mr. Friedman. While conducting his research, Mr. Clark, with NSA's knowledge, had complete and unrestricted access to the collection during a two-week period of review spent at the Library in late 1975. The collection was opened eventually to the public in January 1978.

Between December 1970 and January 1978, NSA representatives conducted three reviews in January 1971, November 1971, and July 1974 "devoted to assessing the organization of the collection and its historical significance, but [they] were not systematic classification reviews." Affidavit of Meyer J. Levin ("Levin Affidavit") ¶ 7.

The first systematic classification review of the Friedman Collection occurred in July 1975. Vincent Wilson, an NSA employee with declassification authority, visited the Library at that time and declassified several hundred items, including two monographs that were reclassified in October

---

1. The named plaintiffs in this suit include the American Library Association, the District of Columbia Library Association, the Virginia Library Association, the American Historical Association, the Organization of American Historians, the Center for National Security Studies, and Mr. Jay Peterzell.

1981 and are at issue in this case. *Id.;* Plaintiffs' Statement of Material Facts and Response to Defendant's Statement of Material Facts ("Plaintiffs' Facts") ¶ 6. These two monographs, entitled *General Solution for the Double Transposition Cipher* (*"General Solution"*) and *Analysis of the Hagelin Cryptograph Type B–211* (*"Hagelin Cryptograph"*), were made available to the public in January 1978 when all unclassified and declassified portions of the Friedman Collection were opened.

NSA representatives visited the Library again in November and December 1976 to conduct a classification review of portions of the collection. Levin Affidavit ¶ 8. These reviewers identified various documents from the Friedman correspondence files "which related, either directly or indirectly, to official and sensitive work of NSA, including, *inter alia,* a cryptologic relationship between the United States and a foreign government the existence of which was classified, ... at the SECRET level." *Id.* The archivist of the Library was made aware of the sensitive nature of these documents and both he and the NSA reviewers agreed that the sensitive materials should be pulled from the open shelves and placed in a safe.[2]

In June 1981, NSA received information that sensitive materials in the collection had been placed on the open shelves by the Library. This information prompted a visit in October 1981, by Russell Fisher and other NSA reviewers, who examined all the technical books, pamphlets, and monographs contained on the open shelves and held in the safe. This review resulted in the declassification of numerous materials, including the third technical monograph at issue here, *Analyses of a Mechanico-Electrical Cryptograph* (*"Mechanico-Electrical Cryptograph"*), Levin Affidavit ¶ 9; Plaintiffs' Facts ¶ 9, and the reclassification of the *General Solution* and *Hagelin Cryptograph* monographs. The NSA reviewers also classified five technical text-

books, pamphlets, and monographs which had been declassified in July 1975. The reviewers did not examine the Friedman correspondence files.

The first review of Mr. Friedman's correspondence was conducted by Mr. Wilson and two other NSA employees between November 30 and December 2, 1976. They identified several items (including no more than six of the items at issue) as being sensitive and Mr. Wilson and the then-archivist of the Library, Anthony Crawford, agreed that these materials would be segregated from the rest of the correspondence and placed in a safe. Levin Affidavit ¶ 10; Plaintiffs' Facts ¶¶ 11–12. However, none of these sensitive pieces of correspondence was classified by Mr. Wilson.

Public access was given in 1978 to the Friedman correspondence with the exception of the items identified as sensitive by Mr. Wilson in 1976. Subsequently, these sensitive materials were opened to the public on October 1, 1979 by Mr. Crawford without prior consultation with NSA.

In 1982, James Bamford released his book about NSA entitled, *The Puzzle Palace.* A review of the book revealed that materials in the Friedman correspondence files identified previously as sensitive in 1976 by NSA reviewers may have been made available to Mr. Bamford. Mr. Bamford apparently had access to all of the correspondence during his visits to the Library in 1979.

In response to the book's publication, Messrs. Meyer and Fisher visited the Library in April 1983 to identify and review the sensitive materials opened in 1979. They determined that some of the items sequestered by Mr. Wilson in 1976 could be made available to the public and some should be withheld. They also identified sensitive items which had not been sequestered by Mr. Wilson in 1976 and had been available to the public since January 1978. Messrs. Levin and Fisher classified some of these items but did not classify all the

---

2. The Court notes with interest that defendant admits that "[t]he documents identified as sensitive were not marked as classified, though NSA intended that they be treated by the Library as such." Affidavit of Meyer J. Levin ("Levin Affidavit") ¶ 8.

materials as sensitive. They directed the Library's archivist, John Jacob, to seal these materials pending review. Mr. Fisher also reclassified the *Mechanico-Electrical Cryptograph* monograph during this visit.

On May 31 and June 1983, plaintiff Jay Peterzell visited the Library and reviewed the open portions of the Friedman Collection. He found that each withdrawn document had been replaced by a notice of withdrawal. These notices identify the withdrawn document and indicate the reason for withdrawal, either "classified" or "for other reasons."

Upon further inquiry, Mr. Peterzell learned that the majority of the withdrawn items had been withdrawn for "other reasons." He then requested access to the withdrawn documents and the Library officials refused. They explained to him that they were bound by NSA's directions and that Mr. Peterzell could not have access to the withdrawn items unless NSA consented to making them available to the public.

On January 5, 1984, Mr. Peterzell telephoned the Library to inquire about the status of the withdrawn documents and was informed that there had been no change since his last visit. Counsel for plaintiffs wrote to the defendant on January 16 and 23, 1984, to inform him of their request for access to the withdrawn documents and to request rescission of NSA's instructions to the Library to deny public access to the documents.

On January 26, 1984, NSA's general counsel telephoned plaintiffs' counsel and informed him that NSA would not grant their request. Plaintiffs subsequently filed the instant action on February 15, 1984.

Plaintiffs assert several grounds in their complaint to support their request for declaratory and injunctive relief. They contend, *inter alia*, that,

[a]. NSA lacks legal capacity to direct a private library to withdraw unclassified documents from public access.

[b]. NSA's decision to the Marshall Library to remove unclassified documents from public access is an unwarranted interference with the First Amendment rights of plaintiffs and other members of the public who seek access to such documents in the Friedman collection.

[c]. NSA lacks legal authority to classify documents that have been available to the public and to direct a private library to withdraw such documents from public access.

[d]. NSA's classification of documents which have been available to the public and the Agency's direction to the Marshall Library to remove such documents from public access are an unwarranted interference with the First Amendment rights of plaintiffs and other members of the public who seek access to such documents in the Friedman collection.

Plaintiffs' Complaint ¶¶ 37–40.

Defendant filed a motion to dismiss or in the alternative for summary judgment which rejects all of plaintiffs' claims and plaintiffs cross-moved for summary judgment. Plaintiffs' cross-motion reasserts the basic contentions of their complaint but, in addition, they contend that "NSA's classification decisions so far departed from the procedures imposed by the relevant Executive Orders on classification that those decisions are void." Plaintiffs' Motion for Summary Judgment at 2.

The Court also conducted an *in camera* inspection of the classified affidavit of Mr. E. Rich, Deputy Director, National Security Agency.

## II. *Discussion*

The arguments presented by both sides place before the Court essentially one novel issue for determination: whether plaintiffs have a first amendment right of access to classified documents which were previously disclosed to the public where their disclosure may pose a threat to the national security. This case involves a request for access to government documents, and is fashioned as a first amendment claim rather than a violation of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1977 & Supp.1985). For this reason, the Court finds the cited FOIA cases to be inapposite

and thus not controlling in this matter. The soundness of this approach is evident given FOIA's exemption of classified information from its underlying policies of full disclosure of government records. 5 U.S.C. § 552(b)(1).

However, before examining the issue presented by the parties, the Court will first address plaintiffs' contentions that NSA lacks the capacity or authority to direct the Library to withdraw the disputed documents from their shelves either before or after their classification.

Plaintiffs argue that "the 25 [3] pieces of correspondence and three technical publications which NSA approved for public disclosure are the unrestricted property of the Library and that NSA lacks the authority to exercise any control over these documents." Plaintiffs' Motion for Summary Judgment at 14. They do not, however, dispute NSA's right to review the Friedman Collection for classified information prior to the grant of public access. Plaintiffs contend simply that "after a government agency determines that a former employee can make public his writings or personal papers, the agency cannot later change its mind, at least where the materials have in fact been made available to the public." *Id.*

NSA counters plaintiffs' arguments and contends that NSA never renounced its control over the documents and that the documents did not become the unrestricted property of the Library pursuant to Mr. Friedman's gift. The Court agrees with NSA.

■ Section 6(a) of the National Security Agency Act of 1959, Pub.L. No. 86–36, 73 Stat. 63 (1959) (codified as amended at 50 U.S.C. § 402 note (1982)), provides in pertinent part that "nothing in this Act or any other law ... shall be construed to require

the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof, or of the names, titles, salaries, or number of the persons employed by such agency." 50 U.S.C. § 402 note. As conceded by plaintiffs, "[i]t is evident from this language that the statute relieves NSA from obligations to disclose information about the Agency's activities and its employees." Plaintiffs' Motion for Summary Judgment at 18. The Court, therefore, "find[s] the plain wording of the statute conclusive in the present case." *Hayden v. National Security Agency*, 608 F.2d 1381, 1389 (D.C.Cir.1979) (found that in enacting Public Law No. 86–36 Congress was fully aware of the unique and sensitive activities of the Agency which require extreme security measures). It appears to the Court that NSA, in furtherance of this statutory grant, had the authority to instruct the Library as to how to maintain documents in the Friedman Collection that contain sensitive information about its activities.

The fact that Mr. Friedman had taken a secrecy oath while employed at NSA in which he acknowledged his obligations not to disclose information concerning NSA gives further credence to the Court's conclusion. The restraint on disclosure imposed by the oath did not magically disappear once the Library took possession of the Friedman Collection. Contrary to plaintiffs' assertions, the restraint remained in place at the time of the documents' eventual transfer to the Library. Therefore, actions taken by NSA to insure compliance with that oath, *i.e.*, classification of the documents and instructions to the Library to withdraw them from the public shelves, are valid. This is especially true where the subsequent classification is based on a determination that the contin-

---

**3.** The current archivist, John Jacob, compared the items classified by Meyer J. Levin in February 1984 with the list of items segregated, but not classified by Vincent Wilson in November and December 1976 and found that no more than six of the currently classified letters were among those segregated in 1976. Affidavit of John Jacob ("Jacob Affidavit") ¶ 8. This means

that at least *25* of the currently classified pieces of correspondence were available to the public between January 1978 and April 1983. The remaining six items were made available to the public by the archivist, Anthony Crawford, without NSA's approval between October 1979 and April 1983.

ued disclosure of the documents' contents jeopardizes the national security.

■ The Court will now address the main issue presented by plaintiffs: whether plaintiffs have a first amendment right of access to classified documents which were previously disclosed to the public where their disclosure may pose a threat to the national security.

Plaintiffs contend that "[t]he First Amendment bars NSA from restraining public access to all 34 documents currently in dispute, including the six which were made public contrary to NSA's wishes, as well as the 28 which NSA approved for public release." Plaintiffs' Motion for Summary Judgment at 19. They assert that once the documents were in the public domain, any subsequent classification by NSA infringed upon their first amendment right to access to such information. Defendant, on the other hand, argues that the first amendment does not compel the Federal Government to provide access to classified documents, especially when such disclosure can be reasonably expected to cause damage to the national security. The Court agrees with NSA.

■ The first amendment provides, in pertinent part, that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. A close examination of the relevant case law in light of the facts of this case leads the Court to conclude that no first amendment right exists where disclosure of classified information would possibly endanger the national security, even though the information had been previously in the public domain.

Plaintiffs cite *Oklahoma Publishing Co. v. District Court*, 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (1977), and *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) as controlling. The Court, however, finds plaintiffs' reliance on these cases to be misplaced.

In *Oklahoma Publishing*, plaintiff challenged a State court's pretrial order enjoin-ing the news media from publishing the name or picture of an 11-year old juvenile defendant in connection with a pending juvenile proceeding charging the boy with delinquency by second-degree murder. The Supreme Court held that "the First and Fourteenth Amendments will not permit a state court to prohibit the publication of widely disseminated information obtained at court proceedings which were in fact open to the public." *Oklahoma Publishing Co. v. District Court*, 430 U.S. at 310, 97 S.Ct. at 1046.

This Court finds that the holding in *Oklahoma Publishing* turned on the fact that "members of the press were in fact present at the [detention] hearing with the full knowledge of the presiding judge, the prosecutor and the defense counsel." *Id.* at 311, 97 S.Ct. at 1047. Also, as noted by the Supreme Court,

> No objection was made to the presence of the press in the courtroom or to the photographing of the juvenile as he left the courthouse. *There [was] no evidence* that the petitioner acquired the information unlawfully or even *without the State's implicit approval.* The name and picture of the juvenile here were "publicly revealed in connection with the prosecution of the crime," ... as much as the name of the rape victim in *Cox Broadcasting* was placed in the public domain.

*Id.* (emphasis added).

The circumstances underlying the instant action are easily distinguishable from those in *Oklahoma Publishing.* First, the petitioner in *Oklahoma Publishing* challenged the district court's pretrial order as a violation of the first amendment's freedom of the press. Here, the plaintiffs assert a violation of their alleged first amendment right of access to government information. Second, the factors which compelled the decision reached in *Oklahoma Publishing* are not present here.

Public access to the 25 pieces of correspondence was available between January 1978 and April 1983; to at least six pieces of correspondence from October 1979 to

April 1983; to two of the technical monographs between January 1978 and October 1981; and to one of the monographs between October 1981 and April 1983.

Plaintiffs also point to the fact that at least five researchers requested and reviewed all 31 pieces of correspondence and at least five of those documents were copied at the researchers' request. Plaintiffs state that between 1980 and 1983, approximately 25 to 100 people *used* the reading room where the technical materials were stored. As noted by both sides, these figures are not complete because the Library's record-keeping system was not set up until 1981 or 1982 and the records for one year are missing.

While it is true that the disputed documents were part of the public domain for varying lengths of time, public disclosure alone is not a sufficient basis for finding a first amendment violation where the national security is at stake. This is especially so given the fact that in April 1982, President Reagan gave NSA the right to "reclassify information *previously declassified and disclosed* if it is determined in writing that (1) the *information requires protection in the interest of national security;* and (2) the information may reasonably be recovered." Sec. 1.6(c), Exec. Order No. 12,356, 3 C.F.R. 166 (1982), *reprinted in* 50 U.S.C. § 401 note at 51 (1982) (emphasis added). It appears to the Court that the inclusion of the above-cited provision evidences an intention by the President to tip the scales in favor of nondisclosure where disclosure may threaten the national security. The Order "recognizes that it is essential that the public be informed concerning the activities of the Government, but that the interests of the United States and its citizens require that certain information concerning the national defense and foreign relations be protected against unauthorized disclosure." *Id.* at 166.

The holding in *Cox Broadcasting* also can be distinguished. In that case, the petitioners, a reporter and its employer-broadcasting company, challenged a Geor-

gia statute making it a misdemeanor to broadcast a rape victim's name. The Supreme Court held that a State may not "impose sanctions on the accurate publication of the name of a rape victim obtained from public records—more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection." *Cox Broadcasting Corp. v. Cohn,* 420 U.S. at 491, 95 S.Ct. at 1044. The reasons given for distinguishing *Oklahoma Publishing* apply with equal force to *Cox Broadcasting.* The Supreme Court simply did not have before it the same caliber of sensitive information that is presently before this Court when it reached its decisions in *Oklahoma Publishing* or *Cox Broadcasting.* For these reasons, the Court finds that neither of these cases controls the disposition of the instant matter.

"As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information." *McGehee v. Casey,* 718 F.2d 1137, 1147 (D.C.Cir.1983) (citations omitted). The cryptological information at issue is a clear example of "traditionally nonpublic government information." "Secrecy in international relations has long been acknowledged to be essential to the functioning of the national government," *id.* at 1143, n. 11, and "it is elementary that the successful conduct of international diplomacy and the maintenance of an effective national defense require both confidentiality and secrecy." *New York Times Co. v. United States,* 403 U.S. 713, 728, 91 S.Ct. 2140, 2148, 29 L.Ed.2d 822 (1970). Given the important interest of national self-preservation, the Court finds that plaintiffs do not have a first amendment right of access to classified materials previously disclosed to the public where their disclosure might endanger the national security.

■ The Court's inquiry does not end here. Plaintiffs do have a general interest in ensuring that NSA properly classified the documents at issue. NSA's explanations for its classification decisions should be neither "conclusory, merely reciting

statutory standards [nor] too vague [n]or sweeping." *Hayden v. National Security Agency*, 608 F.2d 1381, 1387 (D.C.Cir.1979), *cert. denied*, 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

"[J]udicial review of [NSA's] classification decisions, by reasonable necessity, cannot second guess [NSA's] judgments on matters in which the judiciary lacks expertise." *McGehee v. Casey*, 718 F.2d at 1148. A reviewing court "should conduct a *de novo* review of the classification decision, while giving deference to reasoned and detailed [NSA] explanations of that classification decision." *Id.* "[W]hat may seem trivial to the uninformed [ ] may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in context," *United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir.), *cert. denied*, 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972).

As previously mentioned, the Court conducted an *in camera* review of the classified affidavit of Mr. E. Rich, Deputy Director, National Security Agency. After examining this document, the Court concluded that NSA had classified properly the information at issue. Disclosure of this information could be reasonably expected to cause serious damage to the national security.

The Court's decision is not altered in this instance by NSA's apparent failure to comply strictly with the classification scheme authorized in Executive Order No. 12,356.[4] The Court does not condone by any means NSA's cavalier attitude toward its classification determination of the materials at issue, especially the 31 pieces of correspondence. However, the Court believes that this factor alone should not be used as a means to accomplish by the back door what the Court would not permit by the front door—invalidation of NSA's classification determination and disclosure of the infor-

mation in question. The threat posed to the national security is just too great.

For these reasons, the Court finds that there exists no issue of material fact and defendant is entitled to judgment in his favor as a matter of law, Fed.R.Civ.P. 56. The Court, therefore, grants defendant's motion for summary judgment.

---

**4.** Executive Order No. 12,065, 3 C.F.R. 190 (1979), which went into effect on December 1, 1978, was superseded by Executive Order No. 12,356, 3 C.F.R. 166 (1982), *reprinted in* 50 U.S.C. § 401 note at 51 (1982), on August 1, 1982. Therefore any claims by plaintiffs of improper classification under Executive Order No. 12,065 are moot.