# Constitutionality of Regulations Requiring Prepublication Clearance of Books by Former Iranian Hostages

Under the Supreme Court's holding in *Snepp* v. *United States,* 444 U.S. 507 (1980), the broad prepublication clearance requirements in regulations of the International Communications Agency (ICA) would be held unenforceable through judicial process in a wide variety of applications, notably insofar as they apply to previously disclosed information or to the expression of personal opinions by persons who do not regularly have access to classified information.

The Supreme Court is not likely to uphold a prior restraint on publication by ICA employees in the absence of some powerful showing that substantial and specific harm to the United States would probably result if the publication were permitted. The expression of personal opinion not based on classified information would not satisfy this test.

While the issue is not free from doubt, a strong argument can be made that disciplinary action against an employee based on the need for a foreign policy free from internal dissension in the Foreign Service would not be constitutionally impermissible, particularly if the employee maintained responsibilities at a highly visible level. However, the courts might find discipline involving discharge appropriate only if the statements ultimately made severely and irreparably impaired an individual's ability to perform some services as an employee.

June 11, 1981

## MEMORANDUM OPINION FOR THE ACTING DIRECTOR, INTERNATIONAL COMMUNICATIONS AGENCY

This responds to your request for the views of this Office on the constitutionality of certain regulations of the International Communications Agency (ICA) [1] as applied to former Iranian hostages who, as you have informed us, are planning to write books or articles that may be inconsistent with national policy or otherwise injurious to the foreign policy of the United States. For the reasons that follow, we believe that the preclearance requirements of your regulations are probably unenforceable by injunction except to the extent that you seek to prevent publication of classified or sensitive, nonpublic factual information, and are thus able to make a persuasive showing that serious harm to the United States would be likely to result from publication. Despite the breadth of the regulations, however, a lesser showing would be sufficient under the Constitution to justify post-publication discipline such

---

[1] The regulations also apply to employees of the Department of State and the Agency for International Development.

as suspension or discharge if the regulations are violated, but the ICA may not discharge an employee for exercise of First Amendment rights unless it is able to establish that the speech at issue has jeopardized the effective performance of the Foreign Service or of the employee's duties.

## I. Background

Several officers of the ICA were among the American Embassy staff that was seized in Iran on November 4, 1979. Those officers were responsible for carrying out the Agency's duties as press and cultural affairs officials. At least two of the officers [2] have written articles and are currently writing books on the subject. You have informed us that you anticipate that the officers will submit their books or articles to the ICA for clearance in advance of publication. You expect that some of the books may contain comments on current policies of the government that the ICA would prefer not to have published by a Foreign Service officer on active duty.[3] The question presented is whether the ICA may

---

[2] The specific duties of the officers in question are discussed *infra*.

[3] A draft of one of this officer's articles, for example, contains the following statements:

[The officer's wife stated:] ". . . Terrorism has the American public all worked up. So now terrorism is suddenly a Soviet tool. All the terrorists around the world are being aided and egged on by the Soviets. That's the new theory. The leftists in El Salvador therefore have to be defeated because they, like all terrorists, are the tools of the Soviets. Vested American interests once again con the American public and the U.S. government into protecting and promoting their private interests. Client State El Salvador Incorporated is safe for business and monkey business . . . . What's the matter? You look perplexed."

[The officer answered:] "I'm just surprised by the El Salvador thing. I've been cut off from the news. But what you say seems to fit with what I want to say in the book about U.S. foreign policy. Only I thought I'd have to use Cuba, Nicaragua, Taiwan, Korea, the Philippines and of course Iran. [. . .]

"We've paid lip service to the ideals set forth in our Constitution, in the Bill of Rights, but our foreign policy has not only been aggressive, it has been selectively aggressive, manipulated by vested interests to promote profits for small groups. It hasn't been in the interests of the general public, of America, especially in recent years . . . . [I want] a foreign policy that is so tough-minded and practical that it can't be manipulated by vested interests, bankers, manufacturers, farmers, import-export firms . . . [or] our own venturesome military . . . .

"The American public gets conned into seeing fights in countries like Korea, Vietnam, Iran and now El Salvador as contests between the good guys and the bad guys. [. . .]

"The driving force of U S. foreign policy has for years been anti-communism, which in itself is probably not in the real interests of the U.S. . . . . We make *anti-communism* into a religious war. We're emotional and irrational in our opposition to communism. The vested interests are smart enough to play on our obsessive fear. They engineer client states which are profitable to them but most of the profits come from American tax money. The general public pays South Korea is a great example. They can lobby us with our money. . . The vested-interest lobbies have an easy time of it. They play on America's obsessive fear of communism and the American need to be loved and admired by foreigners. We like our foreigners fawning and serving. We like client states

"What's wrong with U.S. foreign policy now? It's based on mindless, emotional opposition to communism. . . We should . . . never back any authoritarian regime anywhere. Not in Iran or Korea or El Salvador."

lawfully order deletions or modifications in the text of such books and discipline the officers should they fail to comply with such orders.

Under ICA regulations, employees must obtain clearance of all writing of "official concern," broadly defined to include materials "which may reasonably be interpreted as relating to the current responsibilities, programs, or operations of any employee's agency or to current U.S. foreign policies, or which reasonably may be expected to affect the foreign relations of the United States." Uniform State/AID/USIA Regulations, 3 Foreign Affairs Manual 626.2. The purpose of the regulation is "to substitute the agency's institutional judgment for the employee's judgment when the question involved concerns either the release or accuracy of information concerning his agency's responsibilities or what conclusions should be drawn from such information." Clearance will be granted only if "all classified material and all material of official concern . . . which is inaccurate, inconsistent with current foreign policy, or can reasonably be expected to affect adversely U.S. foreign relations, has been deleted . . . ." Matters not on a subject of "official concern" need not be cleared.

## II. Discussion

The starting point for analysis of this subject is the decision of the Supreme Court in *Snepp* v. *United States,* 444 U.S. 507 (1980). In that case Snepp, a former employee of the Central Intelligence Agency (CIA), had published a book about certain CIA activities in South Vietnam without submitting the manuscript to the CIA for preclearance. He did so in spite of his written pledge not to divulge without prior authorization any classified material or any information "concerning intelligence or [the] CIA" that had not been made public. The district court and court of appeals found that Snepp's breach of his agreement had irreparably harmed the government. The Supreme Court agreed with the court of appeals that Snepp's agreement was an "entirely appropriate exercise of the CIA Director's statutory mandate to 'protect intelligence sources and methods from unauthorized disclosure.' " *Id.* at 509, n.3 (citation omitted). The Court added:

> [T]his Court's cases make clear that—even in the absence of an express agreement—the CIA could have acted to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment. The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service. The agreement that Snepp signed is a reasonable means for protecting this vital interest.

*Id.* (citations omitted). In dissent, Justice Stevens, joined by Justices Brennan and Marshall, acknowledged that the CIA "has a vital interest in protecting certain types of information," but added that "the CIA employee has a countervailing interest in . . . protecting his First Amendment rights." *Id.* at 520. Accordingly, "[t]he public interest lies in a proper accommodation that will preserve the intelligence mission of the Agency while not abridging the free flow of unclassified information." *Id.* In a supporting footnote, Justice Stevens agreed that the government may regulate certain categories of activities by its own employees that would in other contexts be protected by the First Amendment, but suggested that "none of the cases . . . cite[d] involved a requirement that an employee submit all proposed public statements for prerelease censorship or approval. The Court has not previously considered the enforceability of this kind of prior restraint or the remedy that should be imposed in the event of a breach." *Id.* at 520-21, n.10.

After *Snepp,* the ICA regulations at issue raise three separate questions: (1) whether the preclearance requirement itself is enforceable through injunction; (2) whether, if clearance is denied, the ICA may, through judicial process, prevent publication if the employee refuses to comply with the denial; and (3) whether, if clearance is denied, the ICA may discipline or discharge an employee for publishing or disclosing the material in question.

*A. Enforceability of preclearance requirement through injunction.* You have informed us that the officers in question will voluntarily submit their publications to the ICA for preclearance. As a result, it appears that the officers will not contend that the preclearance requirement is unenforceable through injunction either on its face or as applied. Since, however, the regulations may well come under attack in any litigation on the general subject, we briefly examine the relevant constitutional issues by way of background.

In *Snepp,* the Court upheld the written agreement even though it covered all non-public information bearing on "intelligence" or the "CIA." [4] Moreover, it stated that even in the absence of an express agreement, the CIA could have acted to prevent dissemination of information the disclosure of which would be protected by the First Amendment if it were not carried out by government employees. The Court justified its conclusion on the ground that there was a substantial governmental interest in preserving both the appearance and the reality

---

[4] The Secretary of State, in conjunction with the Director, is authorized to promulgate the regulations in question here under the Foreign Service act of 1980, Pub. L. No. 96-465, 94 Stat. 2071. Under that Act, the Secretary of State "may prescribe such regulations as [he] deems appropriate to carry out functions under this [Act]." 22 U.S.C. § 3926 (Supp. IV 1980) In light of the clear necessity for confidentiality by those who represent the United States in the sensitive area of international relations, we believe that a requirement of preclearance is within this broad grant of rulemaking authority.

of confidentiality with respect to non-public information coming into the hands of CIA officials.

The regulations at issue here are broader and more stringent than the restrictions contained in the agreement involved in *Snepp.* The regulations here are not limited to particular employees having access to sensitive information. They cover any writings—including those merely expressing personal opinions based on facts in the public domain—that relate to the activities of the employee's agency or to current United States foreign policies. This exceptionally broad prohibition would, we believe, be unenforceable through judicial process in a number of its applications. For example, we are aware of no authority to support the conclusion that the many clerical workers of the Department of State or the ICA could be required to preclear any publications that express views that relate to United States foreign policies, but that contain no information that is either classified or classifiable and that is in the public domain. The reasoning of both *Snepp* and *United States* v. *Marchetti,* 466 F.2d 1309 (4th Cir.), *cert. denied,* 409 U.S. 1063 (1972), suggests that such a requirement would be impermissible.

The *Snepp* case involved the potential for the disclosure of non-public information, the revelation of which could have resulted in irreparable harm to the United States. Any preclearance requirement that is designed to prohibit disclosure of public information or the expression of personal opinion by persons who do not regularly have access to classified or classifiable information, as did Snepp, raises more difficult questions under the First Amendment, for the compelling government interests involved in *Snepp* are largely absent in such circumstances. Such a requirement may be justified, if at all, by the potential harm that may occur if some preclearance mechanism is not applied to the expression of personal opinions, at least by a high-level employee of an agency responsible for the conduct of the foreign relations of the United States.

We are able to identify several such potential harms, falling in four general categories. First, the employee could be rendered less credible as a diplomat if he published writings inconsistent with United States policy. Second, the operation of the Foreign Service could be jeopardized if conflicting views were expressed by different officials, for high-level officials might be unable to dissociate their personal and professional capacities, and foreign countries might thus be uncertain of the actual position of the United States. Third, American foreign policy could be undermined if disputes about that policy among high-level government officials were made public. Finally, the employee's superiors might lose confidence that an employee who has sharply criticized current policy will faithfully represent the United States or accurately state its positions on related and other issues.

165

In the context of an effort to obtain some form of prior restraint, these types of injury are likely to be considered less damaging to the United States than those created by the disclosure of non-public and sensitive information bearing on national defense and intelligence activities. In essence, the damage consists of the embarrassment caused to the United States by dissent among high-level officials. As we discuss in more detail *infra,* we believe that the courts would allow the Executive to undertake disciplinary action in order to sanction or deter such dissent. There is, however, no authority for the conclusion that the courts would uphold a prior restraint to prevent the expression of personal views when those views do not purport to contain any classified or sensitive information. *Snepp* stands for the proposition that preclearance may be supportable as a means of ensuring against disclosure of classified or sensitive information; it does not justify the use of such a mechanism, enforceable through an injunction issued by a court, in order to suppress the expression of personal opinion.

We thus conclude that the preclearance requirement would be enforced by an injunction only in order to prevent the disclosure of information of the sort involved in *Snepp*. The consequence of this conclusion is that the preclearance requirement is unenforceable through injunction in a wide variety of applications.[5] Whether the number of impermissible applications is so great as to amount to "substantial overbreadth," *see Broadrick* v. *Oklahoma*, 413 U.S. 601 (1973), is difficult to assess in the abstract. We believe, however, that the possibility that the preclearance requirement would be held unenforceable by injunction on its face may not be regarded as remote.[6]

*B. Restraints in advance of publication.* The next question is whether the ICA may lawfully require the former hostages to delete material appearing in proposed writings. We interpret this question to mean whether the ICA may seek a court order imposing prepublication restraints in the event that its employees refuse to comply with the ICA's decision not to clear certain material.

We note, first, that the exceptionally heavy burden ordinarily imposed on the government to justify a prior restraint, *see New York Times Co.* v. *United States,* 403 U.S. 713 (1971), will probably not be

[5] For this reason, we recommend that the applicability of the preclearance requirement be narrowed to conform to the standards suggested in *Snepp* and this memorandum. The preclearance requirement should be applicable only to employees who have access to and whose writings might contain sensitive or classified information, and to those who are subject to discipline under *Pickering* v. *Board of Education,* 391 U.S. 563 (1968), for statements critical of current policy. With respect to the former, a prior restraint and disciplinary remedies would generally be available in an appropriate case; with respect to the latter, only post-publication remedies would be permissible. *Cf.* n.9, *infra.* If so narrowed, it could be made clear that the purpose of the preclearance requirement is to prevent disclosure of classified or sensitive information, and that disciplinary action would be taken only for such disclosures or for criticism by employees not protected by *Pickering.* Otherwise, the preclearance requirement should be used as a voluntary measure to guard against improprieties.

[6] We do not suggest, however, that the preclearance mechanism may not be used as a voluntary procedure to be used by employees, in order to ensure against improper action on their part and as the basis for disciplinary action against them by their employer. *See infra.*

applied with full force to a prior restraint imposed by the government on disclosure of information by a government employee. *See Snepp* v. *United States, supra.* The *Snepp* case did not, however, involve total suppression of information, but only preclearance and imposition of a constructive trust after the information had been disclosed. In light of the strong and consistent constitutional hostility to prior restraints, *see Near* v. *Minnesota,* 283 U.S. 697 (1931), we do not believe that the Court would uphold the imposition of a prior restraint on an employee's speech in the absence of some powerful showing that substantial harm would result if the speech were permitted.[7] The only court that has addressed this issue reached a similar conclusion, stating that while the preclearance agreement was itself enforceable, a court should "decline enforcement of the secrecy oath . . . to the extent that it purports to prevent disclosure of unclassified information, for, to that extent, the oath would be in contravention of his First Amendment rights." *United States* v. *Marchetti, supra,* at 1317. According to the *Marchetti* court, even a former agent of the CIA "retains the right to speak and write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain." *Id. See also Snepp* v. *United States, supra,* 444 U.S. at 511.

This analysis suggests that the ICA may enjoin publication by its employees only if there is a probability that substantial harm to the United States would be produced by the disclosure.[8] Mere speculation will probably be insufficient. *See New York Times* v. *United States, supra.* Nor do we believe that a court would enjoin publication solely on the basis of the harm that would be produced by criticism of United States policy by a Foreign Service employee, at least if that criticism is based on or contains only facts within the public domain and facts which are neither classified nor classifiable. The courts have held that the harm produced by the expression of mere opinion is far less consti-

---

[7] In the *Snepp* case itself, all three courts found that the publication had irreparably harmed the United States.

[8] We note in addition that ICA employees are protected from reprisal for disclosing certain kinds of information. Under the Foreign Service Act of 1980, Pub. L. 96–465, the Secretary of State is required to prescribe regulations to ensure that members of the Service.

   are free from reprisal for—
      (A) a disclosure of information by a member or applicant which the member or applicant reasonably believes evidences—
         (i) a violation of any law, rule, or regulation, or
         (ii) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety,
      if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs.

22 U.S.C. § 3905(b)(2). We are aware of no statutory provision or executive order that would bar disclosure of the information at issue here. On the other hand, the provisions afford no protection against the pure expression of views, as distinct from the disclosure of information. Furthermore, we are not aware of any information which is threatened to be disclosed in the instant case which is protected by 22 U.S.C. § 3905(b)(2).

tutionally significant than that produced by disclosure of non-public information of the sort involved in *Marchetti* and *Snepp* and that there are very strong considerations in favor of allowing the broadest possible dissemination of opinion, *cf. Pickering* v. *Board of Education, supra; Gertz* v. *Welch,* 418 U.S. 323 (1974). To support such a prior restraint— as distinct from subsequent punishment—a more substantial threat to United States interests must be shown. *See United States v. Marchetti, supra,* at 1317. The expression of purely personal opinion not based on any closely held information or classified information would not satisfy this test. *Id.* Accordingly, we believe that the ICA may impose a prepublication restraint only in order to prevent or ensure against disclosure of classified or similar information.[9]

*C. Discipline.* The Supreme Court has indicated that the government may discharge or discipline employees for speech that would be protected by the First Amendment if made by a private citizen. In the leading case of *Pickering* v. *Board of Education,* 391 U.S. 563 (1968), the Court held that a Board of Education could not discharge a teacher for submitting to the local newspaper a letter attacking the school board's handling of certain bond issue proposals and its subsequent allocation of financial resources between the schools' educational and athletic programs. At the same time, the Court emphasized "that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general," and that "the problem is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer in promoting the efficacy of the public services it performs through its employees." *Id.* at 565.

On the facts of *Pickering,* the Court observed that the teacher's statements were not "directed toward any person with whom appellant would normally be in contact in the course of his daily work as a teacher." Thus no question of maintaining either:

> discipline . . . or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superin-

---

[9] It is not certain that an injunction would issue even in such cases. The regulations state that preclearance will be refused for speech simply because it is "inconsistent with current foreign policy." The regulations thus have a number of impermissible applications and might be held substantially overbroad and therefore unenforceable even in a proceeding brought to prevent disclosure of classified information. To prevent this possibility, the regulations should be narrowed in this regard as well, to provide that clearance will not in all cases be denied merely because the statements are inconsistent with United States policy. Clearance should be denied only when (1) sensitive or classified information would be disclosed, and (2)—for purposes of warning that discipline may result, but not seeking a judicially imposed prior restraint when *Pickering* v. *Board of Education, supra,* discussed *infra,* does not protect the relevant employee from such discipline. *Cf.* n.5 *supra.*

If the regulations are overbroad, a court might grant an injunction on the basis of the common law power to enjoin the disclosure of secrets by an employee. *Cf. Snepp* v. *United States, supra.* This is an untested remedy, however, and its availability cannot be assumed with any confidence.

tendent are not the kind of close working relationships for
which it can persuasively be claimed that personal loyalty
and confidence are necessary to their proper functioning.

*Id.* at 570. In a footnote, the Court added that it "is possible to
conceive of some positions in public employment in which the need for
confidentiality is so great that even completely correct public state-
ments might furnish a permissible ground for dismissal." *Id.* at 570 n.3.
Finally, the Court noted that since "the fact of employment is only
tangentially and insubstantially involved in the subject matter of the
public communication," it would be proper "to regard the teacher as
[a] member of the general public." *Id.* at 574.

Following *Pickering,* the courts have examined a number of factors to
determine whether a public employee may be discharged for exercising
his right to freedom of speech. Those factors include: (1) whether the
speech was directed toward a person with whom the employee would
ordinarily be in contact during his daily work; (2) whether the speech
might threaten harmony among coworkers; (3) whether the speech
would damage the professional reputation of its target; (4) whether the
speech reflected a difference of opinion on an issue of public concern,
or whether it involved an essentially private matter; (5) whether the
employment was substantially involved in the subject-matter of the
speech, or whether the employee spoke as a member of the general
public; (6) whether, because of the high level at which employee
operates and because of his decisionmaking authority, restrictions on
free expression are necessary; and (7) whether the nature of the particu-
lar occupation involved requires special limits on freedom of expres-
sion. *Cf. Cooper* v. *Johnson,* 590 F.2d 559, 561 (4th Cir. 1979).

In the context of proposed publications by former hostages, some of
these factors point toward the same conclusion reached by the Court in
*Pickering.* The proposed publications will apparently relate to issues of
public concern. Moreover, the disclosures will presumably not be di-
rected toward a person with whom the employees have daily contact.
As a result, there would appear to be little danger that the speech will
reflect adversely on a person under whom the employees must work in
a direct ongoing relationship. Further, the employees will presumably
be criticizing decisions that are made by officials operating at a consid-
erably higher level. Finally, it appears that the former hostages would
be expressing their views as members of the public, and not as officials
of the United States. This latter factor would not clearly support a First
Amendment claim, however, for, simply by virtue of their positions,
the continuing employment of the former hostages might be "substan-
tially involved" in the expression of views. Moreover, their views are
presumably noteworthy (and marketable) only because of their employ-
ment-related experience. Further, these employees are in the Foreign
Service. Presumably, any statement by a foreign policy official highly

critical of the United States and its foreign policy may be very damaging to the United States and its efforts to promote its foreign policy. Therefore, the nature of their occupation makes their statements more newsworthy, embarrassing, and damaging to their employer.

Although the issue is not entirely free from doubt, we believe that a strong argument can be made that, as a general rule, disciplinary action based on the need for a foreign policy free from internal dissension within the Foreign Service would not be constitutionally impermissible. There is a clear necessity for a consistent position on issues of policy by all those representing the United States at a high level in the sensitive area of international relations. Both the appearance and the reality of consistency are critical in the area of foreign relations, and any criticism of United States policy by an officer in a high-level position in the Foreign Service threatens that goal. As indicated above, the result of such criticism could be to render the employee less credible as a diplomat, to harm the functioning of the Foreign Service by sending conflicting signals from different Foreign Service officials, and to impair the foreign relations of the United States by revealing disputes among high-level officials.

The strength of this argument will vary according to the level and nature of the duties of the particular officer. Plainly, the First Amendment rights of a Cabinet-level employee do not immunize him from discharge by the President for the expression of views that are contrary to those of the Administration. By contrast, an employee performing clerical or other nonpolicymaking functions would generally be entitled to greater constitutional protection against discharge for expressing personal views on matters of foreign relations. The more highly placed the official, the more destructive the statement; the lower the official, the more the statements appear to be personal views. *Cf. Branti* v. *Finkel,* 445 U.S. 507 (1980) (government may not discharge nonpolicymaking assistant public defender because of political party to which he belongs); *Elrod* v. *Burns,* 427 U.S. 347 (1976) (same with respect to employees of county sheriff).

One of the officials under consideration here is a Foreign Service Information Officer who acted as the Public Affairs Officer at the United States Embassy in Iran.[10] In the course of his diplomatic duties,

---

[10] His position description includes the following
Is responsible for the over-all administration of a total USIS country program and for the maintenance of effective working relationships with the Diplomatic Mission and other United States government agencies. This involves the planning, conduct and continuing evaluation of a coordinated program of information and cultural activities designed to reach selected audience groups throughout the country for the purpose of (a) explaining and interpreting United States objectives and policies and winning support therefor by identifying the country's legitimate aspirations with those of the United States; (b) projecting those aspects of American life and culture which will promote an understanding of our country, our people, our way of life and what we stand for; and (c) countering false and hostile anti-United States propaganda. . . . In
Continued

170

he performed functions as spokesman for the Embassy in matters involving all aspects of diplomacy, explaining and interpreting United States objectives, winning support for United States policies, and countering false propaganda. He represented the United States in communications with the Iranian press, Ministry of Foreign Affairs, and Ministry of Education. His immediate superior was the Deputy Chief of Mission, who operates directly under the Ambassador. Among his functions was the preparation of a country-wide plan on an annual basis for approval by the Department of State.

The second official is a Foreign Service Reserve officer.[11] In Iran he worked under the first official as a subordinate press official. His responsibilities included communications with the press and the Iranian Ministry of Foreign Affairs on a wide range of subjects, including statements of United States policy. Although his contacts with the Iranian government and press were less frequent and on a lower level than those of the first official, such contacts were an ordinary part of his responsibilities at the Embassy.

We cannot, of course, express a definitive view as to the extent to which these individuals could be disciplined for expressing views critical of the United States without knowing facts and circumstances which we do not have at our disposal. It is, however, apparent that

accordance with United States policy and in consultation with the other members of the Country Team, develops the Country Plan which translates the Agency's global mission into definite objectives appropriate to political, psychological, economic and cultural conditions in the country, and which outlines a USIS program of action leading to the achievement of these objectives . . . Insures the fulfillment of USIS responsibilities for (a) the conduct of the educational and cultural exchange programs administered for the Department of State; (b) participation in such other United States government and private exchange programs as are conducted in the country; (c) assisting private local organizations in a position to contribute to the achievement of USIS objectives, such as Bi-National Centers, United States Chambers of Commerce, United States-host country societies; and (d) publicizing in accordance with Mission policy the Agency for International Development program . . . Advises and assists on Mission press and public relations, including the preparation of official announcements, statements and public addresses . . . Provides for establishing and maintaining effective working relationships with (a) appropriate officials in the national government; (b) leaders in the mass media, educational , industrial, labor, professional and technical fields, (c) appropriate representatives of Diplomatic Missions of friendly foreign countries; and (d) representatives of other United States government agencies. . Represents USIS and, as required, represents the Ambassador at important information, cultural or other functions, and in meeting and assisting distinguished visitors from the United States and other countries

[11] His position description includes the following

Officer directs a Branch of the Program Division which has one other American Officer (Publications Officer) and 30 other staff members . . . As Chief of one of four branches of the Program Division, Officer is responsible for the application of all post media capabilities to the support of post programs. . . . [C]arries out publicity activities on behalf of the Iran America Society as coordinated by the Chief, Program Division. Officer is responsible for all other post print and broadcast medial placement activities. [O]btains, prepares, publishes and distributes a variety of materials supportive of speakers, panels, seminars, exhibits and other programs designed to achieve post objectives. The Branch is responsible for all press and broadcast publicity in support under the supervision of the Country Public Affairs Officer In order to accomplish this responsibility, officer is expected to have working knowledge of Iranian media and to establish solid contacts with media professionals.

171

these individuals maintained responsibilities at highly visible levels. Statements highly critical of United States foreign policy could be severely damaging to that foreign policy and to the ability of these individuals to represent the United States in any similar capacities. Because of the high level of their employment, we believe that the ICA could refuse to return these employees to their prior capacities and could impose disciplinary sanctions to guard against the publication in the future of statements which are highly critical of and damaging to United States foreign policy.

Of course, discharge is the most severe form of discipline.[12] If the statements ultimately made do not severely and irreparably impair the abilities of these individuals to perform some services as employees, the courts might find that discipline short of termination is more appropriate. Since this is largely a subjective decision based upon the proven facts as to the employee's conduct and its compatibility with past and future service, it will serve no purpose to speculate further as to the permissible discipline under a variety of potential circumstances. We do believe, however, that discharge may well be permissible if the employee in question cannot be retained in his present position without maintaining a high-visibility or policymaking rule.

### III. Conclusion

For the reasons stated above, we conclude that the preclearance requirements of the ICA regulations would probably not serve to support injunctive relief against the disclosure of personal opinions and previously disclosed facts. Injunctive relief could be obtained, if at all, only on the basis of a persuasive showing that serious and specific harm to the United States would result if disclosure were permitted. Thus, injunctive relief might be available to guard against potential disclosure of classified or closely held information.

Finally, we believe that, if the relevant employees make policy or otherwise perform significant functions as representatives of the United States, they may be disciplined for disclosing information that is not in the public domain, or for expressing views that are plainly inconsistent with the foreign policy of the United States.[13] Whether they can be

---

[12] By statute, members of the Service may be separated from the Service "for such cause as will promote the efficiency of the Service." 22 U.S.C. § 4010. This provision, which affords a right to a hearing, is designed to "continue[ ] the Secretary's authority . . . to separate any member of the Service for cause." *See* S. Rep. No. 913, 96th Cong., 2d Sess. 55 (1980). We note that the "efficiency of the Service" standard has been upheld against an overbreadth challenge on the ground that Congress did not intend to allow discharge for speech protected by the Constitution. *See Arnett* v. *Kennedy,* 416 U.S. 134 (1974). We believe that the ICA regulations, to the extent that enforcement is taken through disciplinary action, would probably be similarly treated, and thus narrowly construed so as not to violate the First Amendment. To avoid a contrary judicial conclusion, however, the regulations should be narrowed. *See* nn. 5 & 9, *supra.*

[13] Of ,course, we express no views on the policy implications of undertaking disciplinary action against a former hostage.

discharged depends on the specific nature of the duties that they are currently performing and the extent to which the public statements may affect their ability to perform those duties.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*